# **TABLE OF EXHIBITS**

Exhibit A    Abstract of Judgment

Exhibit B    Probation Department report for sentencing

Exhibit C    BPH parole hearing transcript (August 10, 2005)

Exhibit D    Petitioner's psychological evaluation

Exhibit E    Superior court order denying habeas corpus petition

Exhibit F    Court of Appeal Order denying habeas relief

Exhibit G    California Supreme Court Order denying petition for review

Exhibit H    Order of the Superior Court Santa Clara County, August 30, 2007, *In re Arthur Criscione*

ABSTRACT OF JUDGMENT — COMMITMENT
SINGLE OR CONCURRENT COUNT FORM
(Not to be used for Multiple Count Convictions nor Consecutive Sentences)

FORM DSL 290.1

SUPERIOR COURT OF CALIFORNIA, COUNTY OF __LOS ANGELES__

BRANCH __SOUTHWEST__

COURT I.D. **190010**

PEOPLE OF THE STATE OF CALIFORNIA   versus

DEFENDANT: **JOSEPH BRADLEY CLARK**   [X] PRESENT   [ ] NOT PRESENT

AKA:

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT   [ ] AMENDED ABSTRACT

CASE NUMBER **A912667**

| DATE OF HEARING (MO)(DAY)(YR) | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 01 16 86 | SWK | CECIL J. MILLS | J. MOORMAN |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| M. SENECHAL | F. HORN | L. HALEVY, DPD | HAMMER |

1: DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONY:

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO DAY YEAR | CONVICTION BY JURY/COURT TRIAL/PLEA | TERM (L,M,U) | TIME IMPOSED YEARS MONTHS |
|---|---|---|---|---|---|---|---|---|
| 1 | PC | 187** | MURDER 2nd | 85 | 12 23 85 | X | | INDETERMINAT |

2. ENHANCEMENTS (CHARGED AND FOUND, STRICKEN, TIME IMPOSED):

| COUNT | 12022(a) C/F S I | 12022(b) C/F S I | 12022.3(a) C/F S I | 12022.3(b) C/F S I | 12022.5 C/F S I | 12022.6(a) C/F S I | 12022.6(b) C/F S I | 12022.7 C/F S I | 12022.8 C/F S I | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | X | X | | | | | | | 1 |

3. OTHER ORDERS:

4. A. NUMBER OF PRIOR PRISON TERMS:

| § | C/F | S | |
|---|---|---|---|
| 667.5(a) | | | 0 |
| 667.5(b) | | | 0 |
| 667.6(b) | | | 0 |

B. NUMBER OF PRIOR FELONY CONVICTIONS:

| § | C/F | S | |
|---|---|---|---|
| 667.5(a) | | | 0 |

5. TIME STAYED §1170.1(f) (DOUBLE BASE LIMIT):

6. TOTAL TERM IMPOSED: ➡ 1

7. [ ] THIS SENTENCE IS TO RUN CONCURRENT WITH ANY PRIOR UNCOMPLETED SENTENCE(S).

8. EXECUTION OF SENTENCE IMPOSED:

A. [X] AT INITIAL SENTENCING HEARING   B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL   C. [ ] AFTER REVOCATION OF PROBATION   D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC §1170(d))

9. DATE SENTENCE PRONOUNCED:

| MO | DAY | YEAR | CREDIT FOR TIME SPENT IN CUSTODY = | TOTAL DAYS | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|---|---|
| 01 | 16 | 86 | | 181 | INCLUDING: 121 | 60 | [ ] DMH  [ ] CDC |

10. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:

[X] FORTHWITH   [ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS   INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:   [ ] CALIF. INSTITUTION FOR WOMEN — FRONTERA   [ ] OTHER (SPECIFY):   [ ] CALIF. MEDICAL FACILITY — VACAVILLE   [X] CALIF. INSTITUTION FOR MEN — CHINO

CLERK OF SUPERIOR COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE _____ J. CHERNUSHIN   DATE JAN 16 1986

This form is prescribed pursuant to Penal Code §1213.5 to satisfy the requirements of Penal Code §1213 (Abstract of Judgment and Commitment) for determinate sentences under Penal Code §1170. A copy of probation report shall accompany the Department of Corrections' copy of this form pursuant to Penal Code §1203c. A copy of the sentencing proceedings and any supplementary probation report shall be transmitted to the Department of Corrections pursuant to Penal Code §1203.01. Attachments may be used but must be incorporated by reference.

Form Adopted by the Judicial Council of California Effective July 1, 1981

ABSTRACT OF JUDGMENT — COMMITMENT
SINGLE OR CONCURRENT COUNT FORM
(Not to be used for Multiple Count Convictions nor Consecutive Sentences)
FORM DSL 290.1

Pen. C. 1213.5.

DISTRIBUTION:   PINK COPY — COURT FILE.   YELLOW COPY — DEPARTMENT OF CORRECTIONS.   WHITE COPY — ADMINISTRATIVE OFFICE OF THE COURTS.   CRC

REPORT—INDETERMINATE SENTENCE,
OTHER SENTENCE CHOICE

FORM CR 291

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **LOS ANGELES**
BRANCH **SOUTHWEST**

COURT I.D.
**1 9 0 0 1 0**

PEOPLE OF THE STATE OF CALIFORNIA        versus     ☒ PRESENT

DEFENDANT: **JOSEPH BRADLEY CLARK**
AKA:                                        ☐ NOT PRESENT

CASE NUMBER(S)
**A912667** – A
– B
– C

REPORT TO JUDICIAL COUNCIL OF: ☒ INDETERMINATE SENTENCE   – D
TO STATE PRISON ☐ SENTENCE CHOICE OTHER THAN STATE PRISON   – E

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 01 16 86 | SWK | CECIL J. MILLS | J. MOORMAN |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| M. SENECHAL | P. HORN | L. HALEVY, DPD | HAMMER |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES:

A. ☐ ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO | DAY | YEAR | CONVICTION BY JURY TRIAL | COURT TRIAL | PLEA | 664 STAY | 12022(a) | 12022(b) | 12022.5(b) | 12022.5 | 12022.6(b) | 12022.7 | 12022.8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 187** | MURDER 2nd | 85 | 12 | 23 | 85 | | | X | | | X | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |

2. A. Number of prior prison terms charged and found

| SECTION | NUMBER |
|---|---|
| 667.5(a) | 0 |
| 667.5(b) | 0 |
| 667.6(b) | 0 |

B. Number of prior felony convictions

| SECTION | NUMBER |
|---|---|
| 667.6(a) | 0 |

3. ☐ Defendant was sentenced to death on counts _____ , _____ , _____ , _____ , _____ .

4. ☒ Defendant was sentenced to State Prison:
   A. ☒ For life, or a term such as 15 or 25 years to life, with possibility of parole, on counts **1 plus 1 yr purs 12022(b)**
   B. ☐ For life without the possibility of parole on counts _____ , _____ , _____ , _____ , _____ .
   C. ☐ For other term prescribed by law on counts _____ , _____ , _____ , _____ , _____ .

5. ☐ Counts _____ , _____ , _____ , _____ , were deemed misdemeanors.
   A. ☐ Defendant sentenced to _____ days in county jail for all counts.
                                  NUMBER
   B. ☐ Defendant fined in sum of $ _____ .

6. ☐ For counts _____ , _____ , _____ , _____ , the defendant was placed on probation.
   A. (1) ☐ Sentence pronounced and execution of sentence was suspended; or
      (2) ☐ Imposition of sentence was suspended.
   B. Conditions of probation included ☐ Jail Time _____ days   ☐ Fine

Other dispositions
   A. ☐ Defendant was committed to California Youth Authority.
   B. ☐ Proceedings suspended, and defendant was committed to California Rehabilitation Center.
   C. ☐ Proceedings suspended, and defendant was committed as a Mentally Disordered Sex Offender.
   D. ☐ Proceedings suspended, and defendant was committed as mentally incompetent.
   E. ☐ Other (Specify) _____

NOTE: PURSUANT TO ARTICLE VI, SECTION 6 OF THE CALIFORNIA CONSTITUTION AND SECTION 68505 OF THE GOVERNMENT CODE, THE CHIEF JUSTICE REQUIRES THAT EACH SUPERIOR COURT SHALL COMPLETE THIS FORM FOR EACH INDETERMINATE SENTENCE TO STATE PRISON OR SENTENCE CHOICE OTHER THAN STATE PRISON. THE REPORTS IMPLEMENT SECTION 1170.4 OF THE PENAL CODE AND SHALL BE MAILED TO: ADMINISTRATIVE OFFICE OF THE COURTS, 350 McALLISTER, 3200 STATE BUILDING, SAN FRANCISCO, CALIFORNIA 94102

1-16-86                    SIGNATURE OF CLERK   **J. Chernushin**

REPORT—INDETERMINATE SENTENCE,
OTHER SENTENCE CHOICE
FORM CR 291 (10/1/81)

Const., Art. VI, § 6
Pen C. 1170.4, 1170.6

CRC ®

TO
ADMINISTRATIVE OFFICE OF THE COURTS

DEPT. SWK

OK'D TO GO S/W NOTED

JAN 21 1986

Date: **Jan 16, 1986** SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

HONORABLE: **CECIL J. MILLS**      JUDGE     **J. MOORMAN**

**M. STALLINGS**    Deputy Sheriff    **M. SENECHAL**

, Deputy Clerk

, Reporter

(Parties and counsel checked if present)

**A912667**

PEOPLE OF THE STATE OF CALIFORNIA    Counsel for   **I. REINER**

VS      Plaintiff   **F. HORN** , DISTRICT ATTY.   BY

DEPUTY

**JOSEPH BRADLEY CLARK**    Counsel for   **W. LITTLEFIELD**

**187 PC 2°**    8241948   Defendant   **L. HALEVY** , PUBLIC DEFENDER   BY

DEPUTY

NATURE OF PROCEEDINGS PROBATION AND SENTENCE

(Boxes checked if order applicable)

PROBATION DENIED. SENTENCE AS INDICATED BELOW.

Whereas the said defendant having................duly....**plead**

guilty in this court of the crime of **MURDER (187 PC), a felony, as charged in Count I of the Complaint, which has been determined to be in the second degree, and having admitted the allegation pursuant to 12022(b) PC to be TRUE.**

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by Imprisonment in the ~~State Prison~~ **for term prescribed by law, 15 years to life, plus one year enhancement pursuant to 12022(b) PC**

☒ Defendant is given credit for.......**181**.................days in custody.   **121 days actual**

**60 days good/work time**

It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles and delivered by him into the custody of the Director of Corrections at the California State Institution

☒ for Men at Chino, California

☐ for Women at Frontera, California

ENTERED

**1-16-86**

**Frank S. Zolin**

COUNTY CLERK

AND CLERK OF THE

SUPERIOR COURT

☐ Remaining count(s) dismissed in interests of justice.

☐ Bail exonerated.

2   76JE05A (REV. 9/80) 9/80   C-109      **JUDGMENT**

PINK ORIGINAL TO FILE    YELLOW COPY TO STATE WIDE DISTRIBUTION

WHITE COPY TO MICROFILM    GREEN COPY TO PROBATION EXPEDITER

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

### PROBATION OFFICER'S REPORT

REPORT SEQUENCE NO.

| DEFENDANT'S NAME(S) | COURT | JUDGE | COURT CASE NO. |
|---|---|---|---|
| JOSEPH BRADLEY CLARK | SW-K | MILLS | A912667 |

| ADDRESS (PRESENT / RELEASE) | HEARING DATE | DEFENSE ATTY. | PROSECUTOR |
|---|---|---|---|
| UNKNOWN | 1-16-86 | HALVEY | |

| BIRTHDATE | AGE | SEX | RACE | DPO | AREA OFFICE | PHONE NO. |
|---|---|---|---|---|---|---|
| 9-28-59 | 26 | MALE | CAUCASIAN | | | |

| CITIZENSHIP STATUS | DRIVER'S LICENSE / EXP. DATE | | | |
|---|---|---|---|---|
| U.S. | | HAMMER | HARBOR | 533-2677 |

| PROBATION NO. | CII NO. | BOOKING NO. |
|---|---|---|
| X- | A06119503 | 8241948 |

TYPE REPORT
XX Probation and sentence
___ Pre-Conviction (131.3 CCP)
___ Post sentence
___ Diversion (Specify) _____

| DAYS IN JAIL THIS CASE. | CUSTODY STATUS/RELEASE DATE |
|---|---|
| ☐ ESTIMATED ☒ VERIFIED  121 | JAIL |

## PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

187 PC - MURDER, COUNT ONE; 12022(B) PC ALLEGATION.

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

187 PC.

| CONVICTED BY | DATE OF CONVICTION/REFERRAL | COUNT(S) CONTINUED TO P & S FOR DISPOSITION |
|---|---|---|
| PLEA | 12-17-85 | NONE |

| PROPOSED PLEA AGREEMENT | SOURCES OF INFORMATION |
|---|---|
| UNKNOWN | |

| DATE(S) OF OFFENSE | TIME(S) |
|---|---|
| 9-18-85 | APPROX. 2:00 AM |

DEFENDANT: (SEE PRIOR RECORD SECTION)
☒ N/A  ☐ SENTENCED TO STATE PRISON/COUNTY JAIL ON CASE ____
☐ ON PROBATION  ☐ PENDING PROBATION VIOLATION  ☐ PENDING NEW CASE
☐ ON PAROLE-REMAINING TIME ____

HOLDS/WARRANTS
☐ YES  ☐ NO

## RECOMMENDATION:

☐ PROBATION  ☒ DENIAL  ☐ DIAGNOSTIC STUDY  ☐ CYA  ☐ OTHER ____
          ☐ COUNTY JAIL  ☐ 707.2 WIC
          ☒ STATE PRISON  ☐ 1203.03 PC

-1- (CLARK)

76P725B—Prob. 195C (Rev. 6/85) PS 8-85

**PRESENT OFFENSE:**
**(CONTINUED)**

| SOURCES OF INFORMATION (this page) |
|---|
| D.A. FILE |

| ARREST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARRESTING AGENCY |
|---|---|---|---|---|---|
| 9-18-85 | APPRX. 2:00 | SELF. | 187 PC | 4844 W. 136TH ST. HAWTHORNE, CA | LASO |

| CO-DEFENDANT(S) | CASE NO. | DISPOSITION |
|---|---|---|
| NONE. | | |

**ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:**

THE DEFENDANT, THE VICTIM, AND TWO COMPANIONS WENT TO A BAR WHERE THEY WERE APPARENTLY DRINKING. THE VICTIM MADE A COMMENT TO THE FEMALE BARTENDER, TO WHICH THE DEFENDANT TOOK EXCEPTION. THEY APPARENTLY ARGUED, WITH THE VICTIM LEAVING THAT BAR AND GOING TO ANOTHER BAR. SOMETIME LATER, THE DEFENDANT WITH TWO COMPANIONS WENT TO ANOTHER BAR, WHERE THEY FOUND THE VICTIM. SOMETIME LATER, AS THE DEFENDANT AND ONE OF THE COMPANIONS WERE WALKING HOME THE DEFENDANT TOLD THE WITNESS THAT HE WAS GOING TO KILL THE VICTIM. HE STATED, "I'M TIRED OF ALL THIS BARRACHA SHIT. I'M GOING TO PUT AN END TO HIM. I'M GOING TO SLASH THAT BASTARD'S THROAT."

WHEN THE DEFENDANT ARRIVED HOME, THE WITNESS OBSERVED HIM TO BE SHARPENING A KNIFE AND AN AX. SOMEONE APPARENTLY HID THE AX FROM THE DEFENDANT.

WHEN THE VICTIM ARRIVED, THE DEFENDANT, WHO OUTWEIGHS HIM BY APPROXIMATELY FIFTY POUNDS, JUMPED ON THE VICTIM AND STARTED STABBING HIM. THE DEFENDANT INFLICTED TWENTY STAB WOUNDS ON THE VICTIM, AND

-2- (CLARK)

76P725B—Prob. 19SC (Rev. 6/85)

2

1  SLASHED THE VICTIM'S THROAT.  DURING THE COURSE OF THE STABBING,

2 THE DEFENDANT BROKE ONE KNIFE, THEN WENT INSIDE AND OBTAINED A SECOND

3 KNIFE TO CONTINUE MURDERING THE VICTIM.  THE VICTIM'S HEAD WAS

4 APPROXIMATELY 50% SEVERED FROM HIS NECK.

5         AFTER MURDERING THE VICTIM, THE DEFENDANT CLEANED HIMSELF

6 UP, CHANGED HIS SHIRT AND WRAPPED THE VICTIM'S BODY IN SOME TYPE OF A

7 MATTRESS COVER.  DEFENDANT HAD APPARENTLY INTENDED TO BURY THE VICTIM

8 IN BACK OF THE GARAGE.

9         A NEIGHBOR, HEARING THE COMMOTION, CALLED THE POLICE,

10 AND WHEN THE POLICE ARRIVED THEY OBSERVED THE DEFENDANT TO BE HOLDING

11 THE VICTIM'S BODY, WRAPPED IN THE MATTRESS COVERING.

12

13

14

15

16

17

18

19

20

21

22

23

-3- (CLARK)

76C692G — PROB. 5A —  PS 1-85

3

**VICTIM:**

SOURCES OF INFORMATION (D.A.)

D.A. FILE

| NAME | COUNT(S) |
|------|----------|
| WILLIAM KARDOS | ONE. |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

DEAD.

INSURANCE COVERAGE

UNKNOWN.

| LOSS: ☒ YES ☐ NO | ESTIMATED LOSS LIFE | RESTITUTION ALREADY MADE NO | APPLIED FOR VICTIM RESTITUTION FUND ☐ UNK ☐ YES ☒ NO |
|---|---|---|---|

**VICTIM STATEMENT:**    THE VICTIM IN THIS MATTER WAS OBVIOUSLY DECEASED, AND

THIS OFFICER HAS BEEN UNABLE TO LOCATE ANY INFORMATION CONCERNING A

NEXT OF KIN.

| RESTITUTION | TOTAL NUMBER OF VICTIMS ONE | ESTIMATED LOSS TO ALL VICTIMS UNKNOWN | VICTIM(S) NOTIFIED OF P&S HEARING ☐ YES ☒ NO |
|---|---|---|---|
| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION: ☐ YES ☐ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. | |

-4- (CLARK)

_____ VICTIM LIST CONTINUES NEXT PAGE

76P725B—Prob. 19SC (Rev. 6/85)

4

1

**PRIOR RECORD:**

SOURCES OF INFORMATION (this page)

2

3

**AKA'S:**
  JOE CLARK.

4

5

6

JUVENILE HISTORY:

7

DEFENDANT STATES HE WAS ARRESTED AS A JUVENILE FOR

8

VANDALISM.

9

ADULT HISTORY:

10

11-26-78    LASO - 602 LPC - INGLE. MC, CASE #M140305-DEFENDANT
           CONVICTED 415 PC - 30 DAYS JAIL SUSPENDED.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

  -5- (CLARK)

5

1  **PERSONAL HISTORY:**

SOURCES OF INFORMATION (this page)

DEFENDANT

2

3  SUBSTANCE ABUSE:

4  _____ No record, indication, or admission of alcohol or controlled substance abuse.

5  _____ Occasional social or experimental use of _____ acknowledged.

6  _____ See below: Indication / admission of significant substance abuse problem.

7  Referred to Narcotic Evaluator ☐ Yes ☐ No          _____ Narcotic Evaluator's report attached

8

Additional information

9  DEFENDANT STATES HE DRINKS ALCOHOL APPROXIMATELY TWO TIMES

10 PER WEEK. USUALLY THREE TO FOUR BEERS. HE STATES THAT HE HAS AN IRREGULAR

11 PATTERN OF GETTING DRUNK. HE STATES THAT HE DOES NOT LIKE TO GET DRUNK.

12 HE FIRST USED MARIJUANA AT AGE FOURTEEN AND LAST USED IN SEPTEMBER 1985.

13 DEFENDANT WOULD USE TWO TIMES PER MONTH. THE DEFENDANT STATES HE HAS USED

14 VALIUMS AND OTHER TRANQUILIZERS, BUT DID NOT USE THEM STEADILY. WHILE IN

15 THE ARMY THE DEFENDANT WAS SENT TO A RESIDENTIAL DRUG TREATMENT PROGRAM

16 FOR SMOKING MARIJUANA.

17

18

19

20

21 PHYSICAL / MENTAL / EMOTIONAL HEALTH:

22  XX  No indication or claim of significant physical/mental/emotional health problem.

23 _____ See below: Indication / claim of significant physical/mental/emotional health problem.

24

Additional information

25

26

27

28

29  -6- (CLARK)

| PERSONAL HISTORY: (CONTINUED) | SOURCES OF INFORMATION (this page)  DEFENDANT |
|---|---|

| RESIDENCE | TYPE RESIDENCE | LENGTH OF OCCUPANCY | MORTGAGE/RENT | RESIDES WITH/RELATIONSHIP |
|---|---|---|---|---|
| | HOUSE | 1966 – ARREST | 0 | SELF |

| RESIDENTIAL STABILITY LAST FIVE YEARS | CAME TO STATE FROM | CAME TO COUNTY FROM |
|---|---|---|
| GOOD | BORN | BORN |

Additional information

THE DEFENDANT STATES THAT HE WAS LIVING IN THE HOME OF HIS FATHER, THAT HIS FATHER HAD DIED TWO YEARS AGO, AND THAT THE HOUSE WAS IN PROBATE.

| MARRIAGE / PARENTHOOD | MARITAL STATUS  SINGLE | NAME OF SPOUSE / PRESENT COHABITANT |
|---|---|---|
| LENGTH OF UNION | NO. OF CHILDREN THIS UNION | SUPPORTED BY |
| NO. PRIOR MARRIAGES / COHABITATIONS | NO. OF CHILDREN THESE UNIONS | SUPPORTED BY |
| NO. OF OTHER CHILDREN  0 | SUPPORTED BY | |

Additional information

| FORMAL EDUCATION:  DEFENDANT STATES HE RECEIVED HIS G.E.D. |
|---|

-7- (CLARK)

76P725B—Prob. 195C (Rev. 6/85)

7

**PERSONAL HISTORY:**
**(CONTINUED)**

SOURCES OF INFORMATION (this page)

DEFENDANT

| EMPLOYMENT STATUS | ☐ EMPLOYED  ☒ UNEMPLOYED | REFERRED TO WORK FURLOUGH  ☐ YES ☒ NO | EMPLOYER AWARE OF PRESENT OFFENSE  ☒ N/A  ☐ YES  ☐ NO |
|---|---|---|---|
| PRESENT / LAST EMPLOYER / ADDRESS / PHONE  AMERICAN ARBORIST  LAWNDALE, CA  ☐ VERIFIED   ☐ UNVERIFIED | OCCUPATION  LANDSCAPE  EMPLOYMENT STABILITY LAST 5 YEARS | PERIOD OF EMPLOYMENT  6-85 - 7-85  TYPES OF PREVIOUS EMPLOYMENT | GROSS MONTHLY WAGE  $5.00 PER HR. |

Additional information

FOR AUGUST AND NOVEMBER OF 1983 THE DEFENDANT WORKED FOR WELLS FARGO AS A SECURITY GUARD. FOR EIGHT MONTHS BETWEEN 1981 AND 1982 THE DEFENDANT WORKED FOR CALIFORNIA PLANT PROTECTION. FOR SEVEN MONTHS BETWEEN 1982 AND 1983 THE DEFENDANT WORKED FOR INTERNATIONAL SECURITY.

| FINANCIAL STATUS | INCOME STABILITY  POOR | | NET MONTHLY INCOME  0 | |
|---|---|---|---|---|
| PRIMARY INCOME SOURCE  UNKNOWN | SECONDARY INCOME SOURCE(S)  NONE | | EST. TOTAL ASSETS  NONE | EST. TOTAL LIABILITIES  NONE |

MAJOR ASSETS / ESTIMATED VALUE

THE DEFENDANT STATES THAT HE AND HIS BROTHER ARE THE BENEFICIARIES ON HIS FATHER'S ESTATE. HE DOES NOT KNOW THE VALUE.

MAJOR LIABILITIES / ESTIMATED AMOUNT (MONTHLY)

UNKNOWN.

Additional information

GANG ACTIVITY    ☐ YES    ☒ NO          Name of Gang _____

-8- (CLARK)

76P725B—Prob. 19SC (Rev. 6/85)

DEFENDANT'S STATEMENT:

      THE DEFENDANT STATED HE DID NOT WISH TO DISCUSS THE PRESENT OFFENSE.

INTERESTED PARTIES:

      THE INVESTIGATING POLICE OFFICER STATES THAT HE FEELS THE DEFENDANT SHOULD GET THE MAXIMUM POSSIBLE SENTENCE.  HE STATES THAT THIS WAS A BORDERLINE FIRST DEGREE MURDER, THAT THE DEFENDANT HAD TOLD A COUPLE OF PEOPLE THAT HE WAS GOING TO KILL THE VICTIM BY CUTTING HIS THROAT AND HE DID SO.  HE STATES THE DEFENDANT CAME HOME, SHARPENED HIS AX WHICH SOMEONE HID AND THEN WHEN THE VICTIM ARRIVED, THE DEFENDANT MURDERED HIM.  HE STATES THAT THE DEFENDANT HAD A LOT OF TIME TO THINK ABOUT WHAT HE WAS DOING, BETWEEN THE TIME HE PLANNED TO KILL THE DEFENDANT AND THE TIME HE DID SO.  HE STATES THAT THE DEFENDANT IS MUCH BIGGER THAN THE VICTIM AND HAD A DECIDED ADVANTAGE.  WHILE HE WAS STABBING THE VICTIM, HE BROKE ONE KNIFE, AND WENT AND GOT ANOTHER ONE.  THE DEFENDANT THEN CLEANED HIMSELF UP, AND THEN INTENDED TO BURY THE VICTIM BEHIND THE GARAGE.  THE DEFENDANT DEFINITELY KNEW WHAT HE WAS DOING.

      THERE WERE FOUR OR FIVE WOUNDS THAT COULD HAVE BEEN FATAL, HOWEVER THE MEDICAL EXAMINER'S REPORT INDICATES THAT THE VICTIM'S THROAT WAS CUT WHILE THE VICTIM WAS PROBABLY STILL ALIVE. THIS IS PROBABLY WHAT KILLED THE VICTIM.

-9- (CLARK)

EVALUATION:

           THE INSTANT CASE IS A VERY BRUTAL PREMEDITATED MURDER. THE DEFENDANT HAD ANNOUNCED TO SOME OF THE WITNESSES IN THIS MATTER THAT HE INTENDED TO CUT THE VICTIM'S THROAT, AND THE DEFENDANT DID SO, AS WELL AS INFLICTING TWENTY STAB WOUNDS. THIS OFFICER DOES NOT CONSIDER THIS SITUATION IN ANY WAY A CRIME OF EMOTION, BECAUSE THERE WAS PLENTY OF TIME FOR THE DEFENDANT TO SETTLE DOWN AND GET HIMSELF UNDER CONTROL BETWEEN THE TIME HE HAD THE ARGUMENT WITH THE VICTIM AND THE TIME THAT HE KILLED HIM.

           ALSO, THE DEFENDANT DOES NOT APPEAR TO HAVE BEEN OUT OF CONTROL DURING THE COMMISSION OF THE MURDER, AND THE TIME PERIOD IMMEDIATELY FOLLOWING THE MURDER. THE DEFENDANT BROKE ONE KNIFE, WENT TO THE KITCHEN AND GOT ANOTHER ONE, AND CAME BACK AND FINISHED THE JOB. AFTER THE MURDER, THE DEFENDANT CLEANED UP, APPARENTLY CHANGED HIS SHIRT, AND PREPARED TO BURY THE BODY. ALSO, WHEN ONE OF THE NEIGHBOR'S HEARD THE NOISE AND INQUIRED, THE DEFENDANT TOLD THEM IT WAS A FAMILY DISPUTE. THESE ARE NOT ACTIONS THAT WOULD BE TAKEN BY SOMEONE WHO IS UNDER THE INFLUENCE OF A DRUG OR NARCOTIC, OR WHO HAS GONE BESERK DURING THE COMMISSION OF A CRIME.

           DUE TO THE ELEMENT OF PREMEDITATION, THE SERIOUS OF THE OFFENSE, AND THE DEFENDANT'S APPARENT COOLHEADEDNESS DURING AND AFTER THE OFFENSE, IT IS FELT THAT A MAXIMUM TIME IN STATE PRISON IS

-10- (CLARK)

10

1    APPROPRIATE.

2              SENTENCING CONSIDERATIONS:

3         CIRCUMSTANCES IN AGGRAVATION:

4         1.    THE CRIME INVOLVED GREAT VIOLENCE AND VICIOUSNESS.

5         2.    THE DEFENDANT WAS ARMED.

6         3.    THE VICTIM MAY BE CONSIDERED PARTICULARLY VULNERABLE,
               DUE TO THE SIZE DIFFERENTIAL BETWEEN THE VICTIM AND
7              THE DEFENDANT.

8         4.    THERE ARE ELEMENTS OF PREMEDITATION.

9         CIRCUMSTANCES IN MITIGATION:

10        1.    THE DEFENDANT HAS AN INSIGNIFICANT PRIOR RECORD.

11        2.    THE DEFENDANT PLED GUILTY AT AN EARLY STAGE OF
               THE CRIMINAL PROCEEDINGS.
12
13             IN CONSIDERING CIRCUMSTANCES IN AGGRAVATION AND MITIGATION,

14   IF THE DEFENDANT WERE COMMITTED TO THE STATE DEPARTMENT OF CORRECTIONS,

15   THE MAXIMUM SENTENCE WOULD BE APPROPRIATE.

16   RECOMMENDATION:

17             IT IS RESPECTFULLY RECOMMENDED THAT PROBATION BE DENIED,

18   THAT THE DEFENDANT BE SENTENCED TO THE STATE DEPARTMENT OF CORRECTIONS

19

20

21

22

23

     -11- (CLARK)

1  WITH PRE-IMPRISONMENT CREDIT OF 121 DAYS.

2  RESPECTFULLY SUBMITTED,

3  BARRY J. NIDORF
   PROBATION OFFICER

4

5

6  BY _____
      DEAN HAMMER, DEPUTY
7     HARBOR AREA OFFICE
      533-2677

8

9  READ AND APPROVED:                    I HAVE READ AND CONSIDERED
                                          THE FOREGOING REPORT OF
10                                        THE PROBATION OFFICER.

11 _____
   RON ORTMANN, SDPO

12 (SUBMITTED: 1-8-86)                   _____
   (TYPED: 1-11-86)                      JUDGE OF THE SUPERIOR COURT
13 DH:JJ(7)

14

15

16

17

18

19

20

21

22

23

      -12- (CLARK)

12

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number D-22138
 )
JOSEPH CLARK )
 )
—————————————————)

**INMATE COPY**

R.J. DONOVAN CORRECTIONAL FACILITY, ROCK MOUNTAIN

SAN DIEGO, CALIFORNIA

AUGUST 10, 2005

10:58 a.m.

PANEL PRESENT:

Ms. Margarita Perez, Presiding Commissioner
Ms. Lee Cox, Deputy Commissioner

OTHERS PRESENT:
Mr. Joseph Clark, Inmate
Ms. Linda Buchalter, Attorney for Inmate
Mr. Laurence Morrison, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

————————  No       See Review of Hearing
————————  Yes      Transcript Memorandum

**Jennyfer Osecheck, Peters Shorthand Reporting**

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 17 |
| Pre Conviction Factors | 22 |
| Post Conviction Factors | 45 |
| Parole Plans | 37 |
| Closing Statements | 68 |
| Recess | 20 |
| Decision | 81 |
| Transcriber Certification | 91 |

--oOo--

1

1  **P R O C E E D I N G**

2      **PRESIDING COMMISSIONER PEREZ:**  Good morning

3  sir.

4      **INMATE CLARK:**  Good morning.

5      **PRESIDING COMMISSIONER PEREZ:**  This is a

6  Subsequent Parole Consideration Hearing for

7  Joseph Clark, C-L-A-R-K, CDC Number D-22138.

8  Today's date is August 10, 2005, we are located

9  at the Richard J. Donovan Facility.  The time is

10  10:58 a.m.  According to the records sir you

11  were received by the Department of Corrections

12  on January 22, 1986.  Your life term began on

13  May 20, 1986 out of the county of Los Angeles.

14  With the offense of murder second, Penal Code

15  Section 187, Case Number LA892667 count one.

16  For which you subsequently received a term of 15

17  years to life, plus one year with a minimum

18  eligibility parole date of December 27, 1995.

19  Sir this hearing is being tape recorded for the

20  purposes of voice identification I am going to

21  go around the room and ask everyone to identify

22  themselves, stating their first name last name,

23  spelling their last names.  When we get to you

24  sir I would like you to provide us with your CDC

25  Number as well.  I will start with myself and go

26  to my right.  My name is Margarita Perez, P-E-R-

27  E-Z, Commissioner with the Board of Parole

2

1  Hearings.

2      **ATTORNEY MORRISON:**  Laurence Morrison, M-O-

3  R-R-I-S-O-N, Los Angeles District Attorney's

4  office.

5      **ATTORNEY BUCHALTER:**  Linda Buchalter, B-U-

6  C-H-A-L-T-E-R, attorney for Mr. Clark.

7      **INMATE CLARK:**  Joseph Clark, C-L-A-R-K, D-

8  22138.

9      **DEPUTY COMMISSIONER COX:**  Lee Cox, C-O-X,

10  Deputy Commissioner.

11      **PRESIDING COMMISSIONER PEREZ:**  Thank you I

12  would also like to know for the record that we

13  have a correctional officer in the room, he

14  will, she will not be participating in today's

15  hearing, she is here for purposes of security.

16  Sir before we begin I would like to ask you to

17  read that document sitting in front of you.

18  Would you read it out loud for me please?

19      **INMATE CLARK:**  ADA, Americans

20      with Disabilities Act, the American

21      with Disabilities Act, ADA, is a law

22      to help people with disabilities.

23      Disabilities are problems that make it

24      harder for some people to see, hear,

25      read, talk, walk, learn, think, work

26      or take care of themselves than it is

27      for others.  Nobody can be kept out of

3

1      public places or activities because of

2      a disability.  If you have a

3      disability you have the right to ask

4      for help to get ready for your BPT

5      hearing, to get to the hearing, talk,

6      read forms and papers and understand

7      the hearing process.  BPT will look at

8      what you asked for to make sure that

9      you have a disability that is covered

10     by the ADA.  And that you have asked

11     for the right kind of help, if you do

12     not get help or you don't think you

13     got the kind of help you need, ask for

14     BPT 1074 Grievance Form.  And also get

15     help to fill it out.

16     **PRESIDING COMMISSIONER PEREZ:**  Do you

17  Understand what that means sir?

18     **INMATE CLARK:**  Yes.

19     **PRESIDING COMMISSIONER PEREZ:**  Tell me what

20  that means in your words.

21     **INMATE CLARK:**  It means that anybody that

22  has a disability that would prevent them from

23  participating in the hearing and understanding

24  what is going on, that is basically --

25     **PRESIDING COMMISSIONER PEREZ:**  That they

26  can request an accommodation.

27     **INMATE CLARK:**  Right.

4

1      **PRESIDING COMMISSIONER PEREZ:**  That is

2   correct sir.  According to the record on April

3   15, 2005, you signed a BPT form 1073 which is

4   the request for reasonable accommodation form in

5   which you indicated that you have no

6   disabilities and that you would not require

7   accommodation for today's hearing.  Is that

8   correct sir?

9      **INMATE CLARK:**  Right.

10      **PRESIDING COMMISSIONER PEREZ:**  Sir do you

11   wear glasses?

12      **INMATE CLARK:**  No.

13      **PRESIDING COMMISSIONER PEREZ:**  Are you

14   hearing impaired?

15      **INMATE CLARK:**  No.

16      **PRESIDING COMMISSIONER PEREZ:**  Have you

17   ever been involved in the Triple CMS, or EOP

18   Programs?

19      **INMATE CLARK:**  No.

20      **PRESIDING COMMISSIONER PEREZ:**  Are you

21   familiar with the programs?

22      **INMATE CLARK:**  I understand them, yes.

23      **PRESIDING COMMISSIONER PEREZ:**  Can you tell

24   me what they are?

25      **INMATE CLARK:**  They are for guys who are on

26   psychotropic medications as far as I know.

27      **PRESIDING COMMISSIONER PEREZ:**  That is

5

1  correct sir.  Mental health programs within the

2  department of corrections.

3      **INMATE CLARK:**  Right.

4      **PRESIDING COMMISSIONER PEREZ:**  And I do

5  note for the record that you do have your GED,

6  is that correct sir?

7      **INMATE CLARK:**  Yes, a high school diploma.

8      **PRESIDING COMMISSIONER PEREZ:**  A high

9  school diploma, did you also get or work on a

10  GED as well, I do note for the record that you

11  have a GED, not necessarily a high school

12  diploma.

13      **INMATE CLARK:**  Yes I had taken part of a

14  GED course, but didn't complete it.

15      **PRESIDING COMMISSIONER PEREZ:**  But you have

16  a high school diploma?

17      **INMATE CLARK:**  I got the high school

18  diploma in Folsom State Prison.

19      **PRESIDING COMMISSIONER PEREZ:**  Ok, great.

20  And I do note that you served in the army on

21  active duty from 1978 to 1981, is that right

22  sir?

23      **INMATE CLARK:**  Yes.

24      **PRESIDING COMMISSIONER PEREZ:**  What was

25  your MOS?

26      **INMATE CLARK:**  11 bravo infantry.

27      **PRESIDING COMMISSIONER PEREZ:**  Infantry,

6

1  ok.  Did you receive an honorable discharge?

2  **INMATE CLARK:**  Yes.

3  **PRESIDING COMMISSIONER PEREZ:**  Ok, do you

4  feel that when you read you understand what you

5  read well?

6  **INMATE CLARK:**  Yes.

7  **PRESIDING COMMISSIONER PEREZ:**  Is there any

8  reason whatsoever where you cannot fully

9  participate in today's hearing?

10  **INMATE CLARK:**  No.

11  **PRESIDING COMMISSIONER PEREZ:**  Counsel have

12  all ADA issues been addressed to the best of

13  your knowledge?

14  **ATTORNEY BUCHALTER:**  Yes, except for the

15  handcuffs, he is shackled and (indiscernible).

16  He has pretty good with hear, so I won't object

17  to this particular case.  Are you ok with that?

18  **INMATE CLARK:**  Yes.

19  **ATTORNEY BUCHALTER:**  I withdraw the

20  objection.  It is only when they are really

21  tight that I have a problem.

22  **PRESIDING COMMISSIONER PEREZ:**  Have all ADA

23  issues been addressed to the best of you

24  knowledge?

25  **ATTORNEY BUCHALTER:**  No problems.

26  **PRESIDING COMMISSIONER PEREZ:**  Sir the

27  hearing is being conducted pursuant to Penal

7

1    Code sections 3041 and 3042 and the rules and

2    regulations of the board of parole hearings

3    governing Parole Consideration Hearings for life

4    inmates.   During today's hearing if we are

5    talking to fast or you have difficulty

6    understanding something that we are trying to

7    convey just let us know, we will stop and

8    backup, we will slow down and make sure you

9    understand before we proceed.   Do you understand

10   sir?

11            **INMATE CLARK:**   Yes.

12            **PRESIDING COMMISSIONER PEREZ:**   Sir, the

13   purpose of today's hearing is to once again

14   consider your suitability for parole.   In doing

15   so we will consider the number and nature of the

16   crimes that you were committed for, your prior

17   criminal and social history and the behavior and

18   programming since you arrival in the California

19   Department of Corrections and Rehabilitations.

20   Commissioner Cox and myself have had the

21   opportunity to review your Central File and your

22   prior transcripts.   And during today's hearing

23   you will be given an opportunity to correct or

24   clarify the record.   We will consider your

25   progress since your last hearing.   Your updated

26   counselors report, psychological report and any

27   other information that may have a bearing on

8

1  your suitability for parole.  We will reach a

2  decision today and inform you of that decision.

3  If you are found suitable for parole the length

4  of your confinement will be explained to you.

5  Before we recess for deliberations, the district

6  attorney, your attorney and you will have an

7  opportunity to make a closing statement.  Your

8  statement should be limited to why you feel that

9  your suitable for parole.  We will then recess,

10  clear the room and deliberate.  Once we have

11  concluded our deliberations we will resume the

12  hearing and announce our decision.  California

13  Code of Regulations states that regardless of

14  time served a life inmate shall be found

15  unsuitable for and denied parole.  If in the

16  opinion of the panel the inmate would pose an

17  unreasonable risk or danger to society.  Do you

18  understand that sir?

19        **INMATE CLARK:**  Yes.

20        **PRESIDING COMMISSIONER PEREZ:**  Sir at

21  today's hearing you have certain rights, the

22  right to a timely notice of this hearing, you

23  have the right to present relevant documents,

24  and a right to view your Central File.  I do

25  note for the record that on April 15, 2005 you

26  were provided the opportunity to review your

27  Central File.  Is that correct sir?

9

1       **INMATE CLARK:** Yes.

2       **PRESIDING COMMISSIONER PEREZ:** Did you

3  review your Central File?

4       **INMATE CLARK:** I never go to do the Olsen

5  Review.

6       **PRESIDING COMMISSIONER PEREZ:** Ok, the

7  record reflects on April 18, 2005, you had the

8  opportunity and you said yes.

9       **INMATE CLARK:** Yes I was provided the

10  opportunity but the file wasn't available.  The

11  counselor hadn't signed paperwork.

12       **PRESIDING COMMISSIONER PEREZ:** That you

13  wanted to review your Central File.

14       **INMATE CLARK:** Right.  Two weeks ago I sent

15  a request for an interview two and I put it in

16  his office.  And I never got any response out of

17  him.  Never go called by him or anything.

18       **PRESIDING COMMISSIONER PEREZ:** Is that the

19  only time you have followed up since April?

20       **INMATE CLARK:** Yes, about two-weeks two and

21  a half weeks ago.

22       **PRESIDING COMMISSIONER PEREZ:** Two and a

23  half weeks ago and you haven't seen your

24  counselor since then?

25       **INMATE CLARK:** No.

26       **PRESIDING COMMISSIONER PEREZ:** Ok, why

27  would you sign a document indicating that you

10

1   reviewed your Central File if you haven't?

2        **INMATE CLARK:**  He told me to get a hold of

3   him and assured me that he would review it with

4   me.

5        **PRESIDING COMMISSIONER PEREZ:**  That he

6   would make the Central File available to you.

7        **INMATE CLARK:**  So I did it in good faith, I

8   did it with him in good faith.

9        **PRESIDING COMMISSIONER PEREZ:**  Did you want

10  to, do you want to review your Central File?

11       **INMATE CLARK:**  I would have preferred to

12  have the opportunity to have done it, but now we

13  are here I don't want to postpone the hearing

14  for that reason.

15       **PRESIDING COMMISSIONER PEREZ:**  So are you

16  waiving your right to review your Central File?

17       **ATTORNEY BUCHALTER:**  May I say, may I

18  interject?  I don't think he is waving his

19  right.  I think you are putting him in a hard

20  position if he says he is waving the right, he

21  just didn't have an opportunity to do it because

22  his attempts were not followed up.

23       **INMATE CLARK:**  I want to go through with

24  the hearing --

25       **ATTORNEY BUCHALTER:**  He is not going to put

26  waiver on the record.

27       **PRESIDING COMMISSIONER PEREZ:**  Then we will

11

1  postpone the hearing.

2      **ATTORNEY BUCHALTER:**  I think you have put

3  him between a rock and a hard place.

4      **PRESIDING COMMISSIONER PEREZ:**  We will

5  postpone the hearing if it is his wish to review

6  his Central File.

7      **ATTORNEY BUCHALTER:**  Then why don't you

8  say, then I will speak for him, he will waive

9  under duress.

10     **INMATE CLARK:**  Yes.

11     **PRESIDING COMMISSIONER PEREZ:**  Then we will

12  postpone the hearing.

13     **ATTORNEY BUCHALTER:**  I don't think that is

14  a good idea Commissioner.

15     **PRESIDING COMMISSIONER PEREZ:**  Then how can

16  he wave under duress?

17     **ATTORNEY BUCHALTER:**  Because you have said

18  you are going to postpone the hearing in which

19  he does not want postponed.

20     **PRESIDING COMMISSIONER PEREZ:**  He wants the

21  opportunity to review his Central File, he had

22  indicated to us today that he was not provided

23  the opportunity to review his Central File, that

24  he signed a document in good faith and that the

25  Central File was not provided to him and that he

26  would like to review his Central File before he

27  has this hearing.

12

1    **ATTORNEY BUCHALTER:**  In that case, my

2    comments are on the record I believe so go ahead

3    and make the waiver if you wish at this time.

4    **INMATE CLARK:**  I will wave my right to

5    review my Central File.

6    **PRESIDING COMMISSIONER PEREZ:**  So you want

7    to wave your right to review your Central File,

8    and you want to proceed forth with your hearing

9    today?

10    **INMATE CLARK:**  Yes.

11    **PRESIDING COMMISSIONER PEREZ:**  We can

12    postpone the hearing if you would like the

13    opportunity to review your Central File?

14    **INMATE CLARK:**  I wave the right to review

15    my Central File.

16    **PRESIDING COMMISSIONER PEREZ:**  Ok.

17    **ATTORNEY BUCHALTER:**  So that he can go

18    forward with the hearing.

19    **PRESIDING COMMISSIONER PEREZ:**  Ok, so then

20    we will then proceed forward with the hearing.

21    Counsel has all your clients rights been met to

22    the best of your knowledge, with exception of

23    the issue we just discussed?

24    **ATTORNEY BUCHALTER:**  Yes.

25    **PRESIDING COMMISSIONER PEREZ:**  Sir you also

26    have an additional right, that is the right to

27    be heard by an impartial panel.  Do you have any

13

1  objections to today's panel?

2      **INMATE CLARK:**  No.

3      **PRESIDING COMMISSIONER PEREZ:**  Counsel do

4  you have any objections of today's panel?

5      **ATTORNEY BUCHALTER:**  No Commissioner.

6      **PRESIDING COMMISSIONER PEREZ:**  Sir you will

7  receive a copy of our written tentative decision

8  today, that will be effective within 120 days.

9  In the future you will receive an official copy

10  of the decision as well as a copy of the today's

11  transcript.  The Board of Prison Terms has

12  eliminated its appeals process.  So what that

13  means is in terms of this hearing if you

14  disagree with the outcome of this hearing you

15  have the right to go to the court and make a

16  complaint.  Do you understand sir?

17      **INMATE CLARK:**  Yes.

18      **PRESIDING COMMISSIONER PEREZ:**  Sir during

19  todays hearing you are not required to admit the

20  offense or are you required to discuss the

21  offense.  However it is important for you to

22  understand that the panel does accept true the

23  findings of the court.  We are not here to retry

24  your case.  Do you understand that sir?

25      **INMATE CLARK:**  Yes.

26      **PRESIDING COMMISSIONER PEREZ:**  Commissioner

27  Cox will we be utilizing any confidential

14

1  information during today's hearing?

2      **DEPUTY COMMISSIONER COX:**  No.

3      **PRESIDING COMMISSIONER PEREZ:**  Thank you.

4  Sir I have passed a checklist marked exhibit one

5  to your counsel to insure that we are all

6  operating off of the same documents.  And at

7  this time I will ask her to verify to the

8  accuracy of the documents.

9      **ATTORNEY BUCHALTER:**  Yes.

10      **PRESIDING COMMISSIONER PEREZ:**  Now I will

11  ask the Deputy District Attorney the same

12  question?

13      **ATTORNEY MORRISON:**  The District Attorney

14  has all documents.

15  ------**PRESIDING COMMISSIONER PEREZ:**  Great,

16  counsel are there additional documents to be

17  submitted to this panel, other than what is

18  already been submitted?

19      **ATTORNEY BUCHALTER:**  No.

20      **PRESIDING COMMISSIONER PEREZ:**  Will your

21  client be speaking with us today?

22      **ATTORNEY BUCHALTER:**  Commissioner, you have

23  advised my client that he has the right to not

24  speak about the life offense today and of course

25  we all understand that can not be held against

26  him if he chooses to exercise that right.  I

27  have advised my client to not speak about the

15

1   life offense today.  He has discussed the facts

2   of the case with the panel members on prior

3   occasions.  And he has discussed the facts many

4   times with others, such as counselors,

5   psychologists, psychiatrists, probation

6   officers, and others.  His version of the facts

7   have been documented on many occasions, we are

8   not here to retry this case, we are here only

9   about whether or not he poses a danger to

10  society at this point and time.  And not his

11  dangerousness at the time of the commitment

12  offense.  If there are any discrepancies in his

13  version of the facts and others who may have a

14  version that is different he will accept

15  whatever view the panel chooses to accept.

16  Nothing alters the fact of the crime that my

17  client accepts full responsibility and that he

18  is being punished for that offense.  His

19  punishment includes and expectation of being

20  released after he has served the minimum

21  required by law and no longer poses and

22  unreasonable risk or harm to others.  We are

23  here today about the factors hearing, bearing on

24  that question.  He will discuss with you all

25  other manners including his feelings about the

26  life offense.  Thank you.

27        **PRESIDING COMMISSIONER PEREZ:**  So, the

16

1  answer is no he will not be discussing the

2  commitment offense?

3      **ATTORNEY BUCHALTER:**  On my advice that is

4  correct.

5      **PRESIDING COMMISSIONER PEREZ:**  Do you have

6  any preliminary objections?

7      **ATTORNEY BUCHALTER:**  No.

8      **PRESIDING COMMISSIONER PEREZ:**  Thank you.

9      **ATTORNEY MORRISON:**  Commissioner I would

10  like to make a note since counselor read that

11  lengthy statement.  The inmate has an absolute

12  constitutional right to discuss with the board,

13  if he chooses, whether his lawyer advises him to

14  or not.  Just so he understands that and that it

15  is a personal choice on his.  So we don't have a

16  subsequent habeas corpus allegation that he

17  really wanted to and his lawyer advised him not

18  to.  Perhaps we should, the chair could take a

19  personal waiver from the inmate, that is right

20  to speak about he crime.

21      **PRESIDING COMMISSIONER PEREZ:**  I understand

22  sir that your attorney has advised you not to

23  disclose the crime with us today and as I

24  indicated to you earlier you are not required to

25  discuss the offense or to admit to the offense

26  during today's hearing.  It is certainly your

27  choice whether or not you want to discuss the

17

1    offense with us during today's hearing.  So I

2    will ask you, I understand what your counsel has

3    advised you of, and I am asking you if it is

4    your wish to discuss the offense with the panel

5    today?

6         **INMATE CLARK:**  No, it was my wish not to.

7         **PRESIDING COMMISSIONER PEREZ:**  Ok.

8         **INMATE CLARK:**  She advised me not to.

9    After I had told her I didn't want to discuss

10   it.

11        **PRESIDING COMMISSIONER PEREZ:**  Ok, great, I

12   think that is clear.  Sir I need to swear you in

13   would you please raise your right hand.  To the

14   best of your ability do you solemnly swear or

15   affirm that the testimony that you provided

16   today will be the truth the whole truth and

17   nothing but the truth.

18        **INMATE CLARK:**  I do.

19        **PRESIDING COMMISSIONER PEREZ:**  Thank you

20   sir.  I would like to start out by incorporating

21   into the record specific information as it

22   relates to the commitment offense.  I will be

23   referring to the February 2005 board report,

24   prepared by correctional counselor one G.

25   Rodriguez, R-O-D-R-I-G-U-E-Z, and reviewed by

26   correctional counselor two, D. Tapia, T-A-P-I-A.

27   And what I am going to do is read into the

18

1    record the summery of the crime as well as the

2    prisoners version pages one and two.    In terms a

3    summery of the crime the record states that on

4    September 8 1985, Clark and the victim Mr.

5    Cardoz and two other companions went the a bar

6    where they were apparently drinking.    Mr. Cardoz

7    made a commitment, excuse me, a comment to the

8    female bartender to which Clark took exception

9    to the comment.    The two apparently began to

10   argue with Cardoz, leaving and going to another

11   bar.    Later Clark with two other companions went

12   to another bar where they found Mr. Cardoz.

13   Sometime later as Clark and one of the

14   companions were walking home he told his

15   companion that he was going to kill Cardoz.

16   Clark stated I am tired of all this buracha

17   shit, I am going to put a end to him.    I am

18   going to slash that bastard's throat.    When

19   Clark arrived home his companion observed him

20   sharpening a knife and ax.    Someone apparently

21   hid the ax from Clark.    When Cardoz arrived,

22   Clark who outweighed Cardoz by approximately 50

23   pounds, jumped on him stabbing him.    Clark

24   inflicted 20 stab wounds to Mr. Cardoz and

25   slashed his throat.    During the course of the

26   stabbing Clark broke one knife then went inside

27   and obtained a second knife to continue

19

1   murdering Cardoz.  Mr. Cardoz's head was

2   approximately 50 percent severed from his neck.

3   After murdering Cardoz, Clark cleaned himself

4   up, changed his shirt, and wrapped Cardoz's body

5   in a mattress cover.  Clark has apparently

6   intended to bury the victim in the back of the

7   garage.  A neighbor hearing the commotion called

8   the police, and the police arrived, and they

9   observed Clark holding Mr. Cardoz's body wrapped

10  in a mattress blanket.  The probation officers

11  report states on page nine that there were four

12  or five wounds that could have been fatal.

13  However, the medical examiners report indicates

14  that the victim throat was cut while the victim

15  was probably still alive.  This is what probably

16  killed the victim.  In terms of the prisoners

17  version, the record states.  Clark states that

18  he had been drinking with the victim, Cardoz and

19  Hopkins along with someone else's name he didn't

20  remember.  Cardoz lost his temper at the bar

21  where they were at with the bartender.  The

22  bartender asked him to leave so he did.  The

23  victim went to another bar to continue to drink.

24  Clark and Hopkins went to the other bar where

25  the victim was to talk to him.  Unexpectedly he

26  became angry at them.  Saying you are playing me

27  to close.  Clark said to him calm down I am not

20

1   your enemy.  The victim responded just leave or

2   I will get your stupid and kill your dumb ass.

3   Clark then told him don't come to my house

4   anymore.  The victim responded with several

5   expletive words that caused a reaction from the

6   bartender because of his patrons.  Clark

7   remembered the bartender saying something about

8   not wanting them in the bar anymore.  Clark said

9   he went home to his house with Hopkins and his

10  friend.  When he arrived he went back into his

11  bedroom.  Hopkins came to his bedroom a few

12  minutes later to tell him that Cardoz was

13  outside.  Clark then yelled at the victim to

14  leave from his house.  He then retrieved a

15  hatchet and went into the living room and looked

16  outside where he saw Cardoz.  He then threw the

17  hatchet on the floor next to chair, where

18  Hopkins was sitting and stepped outside and

19  closed the door, not wanting to let Cardoz

20  inside.  Clark said his intention was to ask him

21  to leave, when the victim attacked him with a

22  knife.  He then overpowered him and took control

23  of the knife and stabbed him in the neck.  But

24  he is not sure how many times he stabbed him

25  before the knife broke.  When he had realized it

26  had been broken he threw the knife into the yard

27  and began punching him as he got to his feet.

1  As Clark got to his feet, the victim was on his

2  hands and knees at which point he stomped on him

3  and told him not to get up.  Clark's neighbor

4  who lived in the front house woke up and another

5  friend of his Eddie Ceas, who was in his house

6  came outside.  His neighbor Holly Beach asked

7  what was going on, Ceas responded by asking her

8  to call the paramedics.  The victim Cardoz

9  continued trying to get up and again he stomped

10  him and incapacitated him.  After realizing he

11  was not moving anymore he returned back into the

12  house.  He then saw that he was cut from the

13  knife on his fingers and went into the kitchen

14  to wash up.  At this time an argument erupted

15  over what should be done.  And he only recalls

16  asking everyone to leave.  When everyone left he

17  went out to see the bloody mess that was the

18  victim.  He then got a sheet from his bedroom

19  and wrapped the victim in it.  Clark then

20  remembers hearing a Los Angeles County sheriff's

21  deputy saying, all right motherfucker don't

22  move.  He was then arrested.  Counsel you

23  indicated that your client would speak in

24  regards to his feelings in regards to the crime?

25       **ATTORNEY BUCHALTER:**  Is that your desire?

26       **INMATE CLARK:**  Yes.

27       **PRESIDING COMMISSIONER PEREZ:**  Ok, how do

1   you feel about this crime today sir?

2       **INMATE CLARK:** It was messed up horrible

3   mess. Bad mistake that I made in my life. Very

4   bad choice. I just lost control.

5       **PRESIDING COMMISSIONER PEREZ:** Well, I cant

6   ask you how you lost control, or why lost

7   control, or how it was a mess because that would

8   be getting into the commitment offense. Is that

9   correct counsel?

10      **ATTORNEY BUCHALTER:** Yes.

11      **PRESIDING COMMISSIONER PEREZ:** Would you

12  agree with that?

13      **ATTORNEY BUCHALTER:** I would.

14      **PRESIDING COMMISSIONER PEREZ:** Is there

15  anything else you would like to add in regards

16  to the crime or excuse me your feelings about

17  the crime?

18      **INMATE CLARK:** No.

19      **PRESIDING COMMISSIONER PEREZ:** Ok, then I

20  will move and discuss with you your criminal

21  history. You were approximately 26 at the time

22  of the offense?

23      **INMATE CLARK:** Yes.

24      **PRESIDING COMMISSIONER PEREZ:** Do you take

25  responsibility for this offense?

26      **INMATE CLARK:** Yes.

27      **PRESIDING COMMISSIONER PEREZ:** Ok, you are

23

1   46 now, is that correct?

2       **INMATE CLARK:**  Yes.

3       **PRESIDING COMMISSIONER PEREZ:**  In terms of

4   your criminal history I am looking at the

5   Federal rap sheet, I am on page one of the

6   Federal rap sheet that is behind the cumulative

7   case summery in the board packet.  And the

8   record states that you were charged with lodging

9   permission and that charge was dismissed.

10  Trespassing and occupying property without

11  owners consent, and that charge was dismissed.

12  And that you were subsequently convicted of

13  disturbing the peace and sentenced to 30 days

14  county jail.  Is that right?

15      **INMATE CLARK:**  I never go any sentence out

16  of it, they must of suspended it.

17      **PRESIDING COMMISSIONER PEREZ:**  I am sorry

18  it was suspended, 30 days sentence suspended.

19      **INMATE CLARK:**  Right.

20      **PRESIDING COMMISSIONER PEREZ:**  Is that

21  correct?

22      **INMATE CLARK:**  Yes.

23      **PRESIDING COMMISSIONER PEREZ:**  Where you

24  placed on probation or anything?

25      **INMATE CLARK:**  No I was just fined and give

26  a 30 day suspended sentence.

27      **PRESIDING COMMISSIONER PEREZ:**  What were

1   the circumstances of the charges?

2       INMATE CLARK:  Well I was in the car with

3   somebody and police wanted to pull him over and

4   he didn't want to stop.  And for that they

5   charged you for lodging without permission?

6       INMATE CLARK:  No they charged me with,

7   what was it, disturbing the peace.

8       PRESIDING COMMISSIONER PEREZ:  Because you

9   were in a vehicle with somebody who didn't want

10  to stop?

11      INMATE CLARK:  Right, he didn't want to

12  pull over, when the squad car behind us flashed

13  his lights, he stepped down on the gas.

14      PRESIDING COMMISSIONER PEREZ:  I guess I am

15  --

16      INMATE CLARK:  Maybe I am misunderstanding.

17      PRESIDING COMMISSIONER PEREZ:  I am a

18  little confused because the charges were lodging

19  without permission, trespass and occupying

20  property with owner --

21      INMATE CLARK:  Right all that was

22  suspended.

23      PRESIDING COMMISSIONER PEREZ:  And that is

24  because you were in a vehicle driving with

25  someone?

26      INMATE CLARK:  No, that was a different

27  thing, I got confused on that.

1      **PRESIDING COMMISSIONER PEREZ:**  Then what

2  was that sir?  What were the circumstances of

3  lodging without permission?

4      **INMATE CLARK:**  That was a bunch of

5  abandoned old houses that were being torn out

6  for the freeway project that was going on for

7  the San Diego freeway.  And so these were houses

8  that were bought by the government and I was on

9  the property.

10      **PRESIDING COMMISSIONER PEREZ:**  Were you in

11  the home?

12      **INMATE CLARK:**  There was no home there.

13      **PRESIDING COMMISSIONER PEREZ:**  Ok, I

14  thought --

15      **INMATE CLARK:**  There was like a bunch of

16  old boarded up houses there and I was on the

17  property.  I wasn't in the home.

18      **PRESIDING COMMISSIONER PEREZ:**  Were you

19  staying on the property?

20      **INMATE CLARK:**  No, they caught me, the

21  police saw me on the property and stopped me,

22  approached me and took me in and charged me.

23      **PRESIDING COMMISSIONER PEREZ:**  So you were

24  not staying there?

25      **INMATE CLARK:**  No, I was there on the

26  property I was definitely there, and there were

27  signs posted, I didn't think, I just was taking

26

1   a short cut through there, they saw me and it

2   was late at night and I was being suspicion I

3   know that.

4       **PRESIDING COMMISSIONER PEREZ:**  What time

5   was it?

6       **INMATE CLARK:**  I know if was probably after

7   midnight.

8       **PRESIDING COMMISSIONER PEREZ:**  What were

9   you doing there?

10      **INMATE CLARK:**  I was walking home from a

11  friend's house.

12      **PRESIDING COMMISSIONER PEREZ:**  Ok, they

13  charged you, you were convicted of disturbing

14  the peace, is that right?

15      **INMATE CLARK:**  Disturbing the peace, maybe

16  that was the one I was talking about, disturbing

17  the peace.

18      **PRESIDING COMMISSIONER PEREZ:**  What was

19  that charge about?

20      **INMATE CLARK:**  I think that is the one in

21  the car.

22      **PRESIDING COMMISSIONER PEREZ:**  You were

23  charged with disturbing the peace when you were

24  a passenger in a vehicle that wouldn't stop that

25  you had no control over.

26      **INMATE CLARK:**  Yes, that is true.

27      **PRESIDING COMMISSIONER PEREZ:**  And

27

1  convicted of it?

2      INMATE CLARK:  Yep.

3      PRESIDING COMMISSIONER PEREZ:  Ok, the

4  record shows, and that happened in Los Angeles,

5  that happened in Los Angeles and is that correct

6  in 1978 or around that time period?

7      INMATE CLARK:  1978, disturbing the peace

8  in 1978, wow.

9      PRESIDING COMMISSIONER PEREZ:  It looks

10  like the same incident.  Then we have, we also

11  have an arrest act in Tacoma Washington, the

12  possession of stolen property.  You were

13  convicted of that according to the record and

14  you received a 30 day suspended sentence and a

15  250-dollar fine.

16      INMATE CLARK:  Right.

17      PRESIDING COMMISSIONER PEREZ:  You were

18  also charged with larceny and petty theft, you

19  were convicted and the sentence was combined

20  with the possession of stolen property.

21      INMATE CLARK:  Right.

22      PRESIDING COMMISSIONER PEREZ:  Does that

23  sound familiar?

24      INMATE CLARK:  Yes.

25      PRESIDING COMMISSIONER PEREZ:  What were

26  the circumstances of that sir?

27      INMATE CLARK:  Somebody had some stolen

28

1  tires and rims in his car and I was with him.

2      **PRESIDING COMMISSIONER PEREZ:**  Did you know

3  the property was stolen?

4      **INMATE CLARK:**  I did when I got arrested.

5      **PRESIDING COMMISSIONER PEREZ:**  So you were

6  saying that were convicted of receiving stolen

7  property when you were in the vehicle of another

8  passenger and he had (indiscernible) knew

9  nothing about.

10     **INMATE CLARK:**  I didn't know until we were

11 getting arrested.  I got in the car with him and

12 the police were waiting for us for him actually.

13 I got in with him and he had tires and rims in

14 the backseat of his car.

15     **PRESIDING COMMISSIONER PEREZ:**  What about

16 the larceny and petty theft?

17     **INMATE CLARK:**  That was all the same crime,

18 the possession of stolen property and larceny

19 and petty theft.

20     **PRESIDING COMMISSIONER PEREZ:**  So you

21 weren't culpable in any of these offenses that

22 you were convicted of?

23     **ATTORNEY BUCHALTER:**  What did you ask?

24     **PRESIDING COMMISSIONER PEREZ:**  Was he

25 culpable, responsible, you weren't responsible

26 in any of these offenses?

27     **INMATE CLARK:**  I was responsible no I

29

1   wasn't responsible for the actual theft.

2        **PRESIDING COMMISSIONER PEREZ:**  What about

3   possessing stolen property?

4        **INMATE CLARK:**  I was in the car, you know

5   hey I will tell you.  The attorney I had for

6   trial said if you don't cop the plea then they

7   will keep you in jail and I was in the army and

8   I didn't want to get into trouble with them.

9        **PRESIDING COMMISSIONER PEREZ:**  Are you

10  saying that in all three convictions, the

11  conviction for disturbing the peace, the

12  conviction for receiving stolen property, and

13  the conviction for larceny and petty theft, that

14  you were not responsible for those three

15  offenses that you were convicted of?

16       **INMATE CLARK:**  No.

17       **PRESIDING COMMISSIONER PEREZ:**  Is there

18  anything else you would like to add, correct or

19  clarify the record relative to your juvenile or

20  adult criminal history?

21       **INMATE CLARK:**  No.

22       **ATTORNEY BUCHALTER:**  There is no juvenile,

23  is there?

24       **INMATE CLARK:**  Yah, there was.

25       **PRESIDING COMMISSIONER PEREZ:**  Yes, he was

26  arrested as a juvenile for vandalism.  Do you

27  recall what year that was sir?

30

1      **INMATE CLARK:**  I think that was 1977.

2      **PRESIDING COMMISSIONER PEREZ:**  1977, can

3  you tell me the circumstances?

4      **INMATE CLARK:**  I threw a bottle through a

5  window.

6      **PRESIDING COMMISSIONER PEREZ:**  You threw a

7  bottle through a window?

8      **INMATE CLARK:**  Right.

9      **PRESIDING COMMISSIONER PEREZ:**  And whose

10  window was that sir?

11      **INMATE CLARK:**  I didn't know.

12      **PRESIDING COMMISSIONER PEREZ:**  You didn't

13  know?  It was somebody's home?

14      **INMATE CLARK:**  No, I threw.

15      **PRESIDING COMMISSIONER PEREZ:**  Was it a

16  business what was it?

17      **INMATE CLARK:**  Yah, it was one of the old,

18  one of the old abandoned houses nobody was

19  living in.  Well they were going to board it up

20  and tear it apart, so somebody, I was a young

21  kid acting foolish threw a bottle through a

22  window.

23      **PRESIDING COMMISSIONER PEREZ:**  Ok, were you

24  under the influence of anything?

25      **INMATE CLARK:**  No.

26      **PRESIDING COMMISSIONER PEREZ:**  You said you

27  were about 17 at the time?

31

1       **INMATE CLARK:** Yes.

2       **PRESIDING COMMISSIONER PEREZ:** The record

3  does show that in 1978 you were convicted of

4  fighting.

5       **INMATE CLARK:** Fighting, no, I don't

6  remember that.

7       **PRESIDING COMMISSIONER PEREZ:** Ok, that is

8  actually in the 2005 counselors report page two.

9  I didn't see that on your Federal --

10      **INMATE CLARK:** I never been arrested for

11  fighting.

12      **PRESIDING COMMISSIONER PEREZ:** Ok, could

13  that have been the disturbing the peace charge?

14      **INMATE CLARK:** I wouldn't say that was for

15  fighting.

16      **PRESIDING COMMISSIONER PEREZ:** Is there

17  anything else you would like to add regarding

18  your juvenile or adult criminal history.

19      **INMATE CLARK:** No.

20      **PRESIDING COMMISSIONER PEREZ:** The record

21  that reflects in terms of your personal factors

22  that on page three of the board report dated

23  February 2005. Which states that you are the

24  youngest of two children. Is that right sir?

25      **INMATE CLARK:** Yes.

26      **PRESIDING COMMISSIONER PEREZ:** What do you

27  have a brother or a sister?

32

1      **INMATE CLARK:**  I have one older brother,

2  but I also have a, my mother got remarried and

3  she had a son and a daughter from the other

4  marriage.

5      **PRESIDING COMMISSIONER PEREZ:**  So you have

6  --

7      **INMATE CLARK:**  I have two other siblings.

8      **PRESIDING COMMISSIONER PEREZ:**  And how old

9  are they sir?

10     **INMATE CLARK:**  I have no idea.

11     **PRESIDING COMMISSIONER PEREZ:**  You don't

12  keep in touch with them?

13     **INMATE CLARK:**  I do but I have no idea how

14  old they are.

15     **PRESIDING COMMISSIONER PEREZ:**  Are they

16  adults?

17     **INMATE CLARK:**  I think they are like 37, 38

18  or around there.

19     **PRESIDING COMMISSIONER PEREZ:**  Where do

20  they live?

21     **INMATE CLARK:**  My brother lives in Colorado

22  and my sister lives with my mother in Lawndale

23  California.

24     **PRESIDING COMMISSIONER PEREZ:**  Lawndale?

25     **INMATE CLARK:**  Yes.

26     **PRESIDING COMMISSIONER PEREZ:**  Do your,

27  odes your mother visit you?

33

1        **INMATE CLARK:** Yes.

2        **PRESIDING COMMISSIONER PEREZ:** How old is

3    she?

4        **INMATE CLARK:** 64.

5        **PRESIDING COMMISSIONER PEREZ:** When was the

6    last time she visited you?

7        **INMATE CLARK:** I think two months ago.

8        **PRESIDING COMMISSIONER PEREZ:** How often

9    does she visit you on a annual basis?

10        **INMATE CLARK:** Probably once or twice a

11    year.

12        **PRESIDING COMMISSIONER PEREZ:** Ok, what

13    about your siblings how often do they visit you?

14        **INMATE CLARK:** I've seen my oldest brother

15    and my youngest brother twice since I have been

16    incarcerated, and my sister twice. They're

17    visits are infrequent.

18        **PRESIDING COMMISSIONER PEREZ:** Do you keep

19    in touch with them over the telephone?

20        **INMATE CLARK:** No.

21        **PRESIDING COMMISSIONER PEREZ:** No, how

22    about letters?

23        **INMATE CLARK:** Occasional letters yes.

24        **PRESIDING COMMISSIONER PEREZ:** Ok, the

25    record doesn't reflect that you are married or

26    that you have any children is that accurate?

27        **INMATE CLARK:** Yes.

34

1      **PRESIDING COMMISSIONER PEREZ:**  And you have

2  never been married?

3      **INMATE CLARK:**  No I have never been

4  married.

5      **PRESIDING COMMISSIONER PEREZ:**  The record

6  does reflect that you were on active duty in the

7  army, we have already discussed that briefly.

8  Why didn't you reenlist in the service once you

9  got out?

10     **INMATE CLARK:**  My dad was having heart

11  problems so I wanted to come home.

12     **PRESIDING COMMISSIONER PEREZ:**  And help

13  take care of him.

14     **INMATE CLARK:**  He passed away two years

15  after I got out.

16     **PRESIDING COMMISSIONER PEREZ:**  Ok, the

17  record does reflect that you have worked for a

18  number of organizations as a security guard.  Is

19  that right sir?

20     **INMATE CLARK:**  Right, yes.

21     **PRESIDING COMMISSIONER PEREZ:**  Ok, the

22  record reflects that you have an extensive use

23  of marijuana and experimentation with cocaine on

24  a few occasions.  Is that right?

25     **INMATE CLARK:**  Not really.

26     **PRESIDING COMMISSIONER PEREZ:**  Tell me what

27  is accurate sir?

1      **INMATE CLARK:**  Excessive use of marijuana.

2      **PRESIDING COMMISSIONER PEREZ:**  Extensive

3  use of marijuana.

4      **INMATE CLARK:**  Yah, extensive, no.

5      **PRESIDING COMMISSIONER PEREZ:**  How about

6  occasionally?

7      **INMATE CLARK:**  Occasional would be more

8  acceptable.

9      **PRESIDING COMMISSIONER PEREZ:**  What about

10  cocaine?

11      **INMATE CLARK:**  I have only tried it a

12  couple of times.

13      **PRESIDING COMMISSIONER PEREZ:**  Have you

14  used any other substances other than those?

15      **INMATE CLARK:**  No.

16      **PRESIDING COMMISSIONER PEREZ:**  Would you,

17  ok, do you feel that you have never felt that

18  you have been addicted to any drug?

19      **INMATE CLARK:**  No.

20      **PRESIDING COMMISSIONER PEREZ:**  The record

21  does reflect that you were sent to a residential

22  drug treatment program while you were in the

23  service for marijuana.

24      **INMATE CLARK:**  I was under the influence

25  that was for alcohol.

26      **PRESIDING COMMISSIONER PEREZ:**  Ok.

27      **INMATE CLARK:**  Because I had been stopped

36

1  on the base, while I was driving and I had been

2  drinking, so that is why I got recommended

3  there.

4          PRESIDING COMMISSIONER PEREZ:  Did you

5  actually go?

6          INMATE CLARK:  How long was the program?

7          INMATE CLARK:  I can't even remember.

8          PRESIDING COMMISSIONER PEREZ:  Was it

9  week's months?

10          INMATE CLARK:  It was months.

11          PRESIDING COMMISSIONER PEREZ:  But that was

12  for alcohol?

13          INMATE CLARK:  Right.

14          PRESIDING COMMISSIONER PEREZ:  Are there

15  any relatives other than the ones that you have

16  already mentioned that you keep in touch with on

17  the outside?

18          INMATE CLARK:  Yes my mother's brother.

19          PRESIDING COMMISSIONER PEREZ:  And where

20  does he live?

21          INMATE CLARK:  He lives in England.

22          PRESIDING COMMISSIONER PEREZ:  In England,

23  I wont ask you how often he visits.

24          INMATE CLARK:  Not very often, but I have

25  seen him twice.

26          PRESIDING COMMISSIONER PEREZ:  At the

27  institution?

37

1      **INMATE CLARK:**  Here at Donovan, yes.

2      **PRESIDING COMMISSIONER PEREZ:**  Is there

3  anything else that you would like to add

4  regarding your personal factors?

5      **INMATE CLARK:**  No.

6      **PRESIDING COMMISSIONER PEREZ:**  In terms of

7  your parole plans the record does reflect that

8  you plan to live with your mother if released

9  from parole in Lawndale.

10      **INMATE CLARK:**  Right.

11      **PRESIDING COMMISSIONER PEREZ:**  Is Lawndale

12  in the county of Los Angeles?

13      **INMATE CLARK:** Yes, it is.

14      **PRESIDING COMMISSIONER PEREZ:**  Ok, in term

15  of employment the record reflects that you don't

16  have confirmed employment offers at this time,

17  that you feel that you would be able to find

18  employment in some of the vocations you have

19  taken advantage of since you have been in CDC,

20  is that correct sir?

21      **INMATE CLARK:**  Yes.

22      **PRESIDING COMMISSIONER PEREZ:**  Ok, let me

23  read into the record your letters of support.

24  And then if I have missed anything relative to

25  your residential or employment plans that you

26  want to note for the record, I will ask you to

27  do it at that time.  You have a letter from your

38

1    mother Josephine Will, this letter is dated, it

2    is actually stamped by the institution, December

3    9, 2004.  And in the letter your mother states

4    that my son no longer posses any risk of harm to

5    others and has paid his debt to society.  He has

6    been in prison for a long time and has spent his

7    time rehabilitating himself to prepare himself

8    for parole.  My son has found a new way to live

9    his life, he plans to live his life in a pro

10    social way and it is his utmost desire to live

11    his life and take great care that he harms no

12    other individuals.  He cares a lot about others,

13    his family and friends.  I believe the

14    information he brings to you will make that

15    showing.  She does further state that she is

16    willing to provide for you until you become self

17    sufficient, provide him with a home shared by

18    me, with all necessary expenses that he might

19    have, such as transportation, clothing and food.

20    You also have a letter from your uncle, John

21    Ruland.

22         **INMATE CLARK:**  John Ruland yes.

23         **PRESIDING COMMISSIONER PEREZ:**  Dated

24    December 9, 2004, and he indicates that he is

25    writing this letter on behalf of my nephew

26    Joseph Clark and in support of his parole.  And

27    in his letter he provides a brief social

39

1    background on you sir.   And states looking back

2    on this period where Joseph was parted by his

3    mother, and her extended maternal family.   I

4    still wonder what an accurate explanation he may

5    have received from his father in what went wrong

6    and how much Joseph's mother and maternal family

7    were to blame for all of this.   During the

8    difficult years that I have been corresponding

9    with Joseph I have noticed over the passing of

10   time, that he has been learning and growing as a

11   responsible adult.   Simply by the way he is

12   expressing himself in writing.   He quickly came

13   to the self-realization that he had a massive

14   debt to society, serious reparation agenda that

15   he had to attend to.   Point offense that he now

16   looks back with the utmost enormous remorse.   He

17   never once complained about his incarcerating

18   conditions or criticism or criticized prison

19   staff.   I also saw that he was learning a great

20   deal about himself and ironically the rest of

21   the world.   He took advantage of furthering his

22   education and discovered that he can do skillful

23   things with his hands to produce beautifully

24   crafted and sought after dollhouses.   In

25   addition to the positive growth and strength and

26   patience Joseph appears to have reached, he

27   strongly identifies with the love from his

40

1  family.  What I can say from my own position,

2  that there will always be a place in my home for

3  Joseph.  And I will continue to wait in hope

4  that one day in the near future he will appear

5  in my doorway.  It is for the above reasons that

6  I am fully supportive of Joseph's release into

7  the community and feel that in no way that he is

8  a danger to society.  We have a letter from your

9  half brother Allan Will, this letter is stamped

10  December 9, 2004.  And this letter Mr. Will

11  states, this letter is written on behalf of my

12  half brother Joseph Clark.  I am fully aware of

13  the life offense that he was sent to prison for

14  and that the court gave him a sentence that

15  permits him to return home.  I respectively

16  request that the parole board strongly consider

17  his good behavior and will find his willingness

18  to return to the community as an asset.  Be it

19  known that if the parole board determines his

20  debt to society paid, Joe can continue to look

21  forward to support from his family and local

22  community.  Are there any other letters of

23  support, that I haven't entered into the record

24  sir?

25      **INMATE CLARK:**  No.

26      **ATTORNEY BUCHALTER:**  There is one document

27  he is the beneficiary of a trust that is to be,

41

1  that was decreed in 1985.  I have the court

2  document and he has private funds of

3  approximately in the upwards of 60,000 thousand

4  dollars.  And I have spoken to the trust

5  attorney, she called because she needed a

6  signature for something and the trust is

7  actually terminated and like next month he will

8  be allowed to have those funds privately.  They

9  will go into an account for him.  Would you like

10 to see the trust documents?

11      PRESIDING COMMISSIONER PEREZ:  Yes, can you

12 hand it to the DA please?

13      PRESIDING COMMISSIONER PEREZ:  Thank you.

14 Sir who does your, does your mom live with

15 anybody?

16     INMATE CLARK:  She lives with my sister and

17 my oldest brother.

18     PRESIDING COMMISSIONER PEREZ:  Ok, does she

19 live in a house or an apartment?

20     INMATE CLARK:  In a house.

21     PRESIDING COMMISSIONER PEREZ:  How many

22 bedrooms in the house?

23     INMATE CLARK:  I think it is three.

24     PRESIDING COMMISSIONER PEREZ:  Three.

25     INMATE CLARK:  And an attached garage.

26     PRESIDING COMMISSIONER PEREZ:  Ok, there is

27 no one in the home on parole or probation or

42

1  anything like that?

2      INMATE CLARK:  No.

3      PRESIDING COMMISSIONER PEREZ:  Ok, is there

4  anything else you would like to add in regards

5  to your employment or residence plans before we

6  move on?

7      INMATE CLARK:  There was some friends of

8  mine that had started a business and it hasn't

9  really taken a trade as a plumber.  But I have a

10  friend that has a plumbing business out there

11  and where I work here is at the energy plant.

12  And I have learned how to do some of the

13  plumbing maintenance around that area.  So I was

14  going to try to get a hold of him, and get a

15  job, but my mom had said that he turned back to

16  alcoholism.  So I just would like to state that

17  there would be a possibility if he is covered

18  and still is operating his business that I could

19  work for him.  And I was unable to get any

20  letter from him, for this hearing.

21      PRESIDING COMMISSIONER PEREZ:  Ok, thank

22  you.  Pursuant to Penal Code Section 3042

23  notices were sent to agencies that might have an

24  interest in your case, such as public defenders

25  office, in the even that you were represented by

26  a public defender, or whomever you were

27  represented by law enforcement, the district

43

1  attorney's office, superior court, and I do note

2  for the record that we did receive one response

3  from the Los Angeles sheriffs office.

4       **ATTORNEY BUCHALTER:**  I don't have that.

5       **PRESIDING COMMISSIONER PEREZ:**  Ok, this

6  particular letter is dated July 18, 2005.

7       **ATTORNEY BUCHALTER:**  I did not receive a

8  copy so I would object to it being used since I

9  have never seen that document.

10      **ATTORNEY MORRISON:**  As long as the

11  institution had it --

12      **ATTORNEY BUCHALTER:**  It is not timely

13  served.

14      **ATTORNEY MORRISON:**  Ten days before it is

15  admissible whether counsel has seen it or not.

16      **PRESIDING COMMISSIONER PEREZ:**  We are going

17  to look at the Central File, if it is in the

18  Central File, is that it right there.  If it is

19  in the Central File, the theory would be that if

20  it is in the Central File, that Central File is

21  available to the inmates attorney and in such it

22  was available.  So we are going to check and see

23  if it was in the Central File.  If it is not

24  then we are not going to allow it into the

25  record.

26      **DEPUTY COMMISSIONER COX:**  Yes there is one

27  in the Central File.

44

1    **PRESIDING COMMISSIONER PEREZ:** Is it dated

2   July 18, 2005? Ok.

3    **ATTORNEY BUCHALTER:** July the 18th, I would

4   have looked at the Central File way before that,

5   I cannot come every week to look at his Central

6   File, therefore it is untimely and I was not

7   served with a copy.

8    **PRESIDING COMMISSIONER PEREZ:** It was

9   timely from the standpoint that the Central File

10  is available to the attorney and the document

11  was placed in the Central File in a timely

12  manner.

13   **ATTORNEY BUCHALTER:** But not thirty days

14  prior to the hearing.

15   **PRESIDING COMMISSIONER PEREZ:** The

16  requirement under our regulations is 10 days.

17   **ATTORNEY BUCHALTER:** I certainly

18  strenuously object to the letter being used

19  since I have not had an opportunity --

20   **PRESIDING COMMISSIONER PEREZ:** I am going

21  to overrule your objection and read it into the

22  record.

23   **ATTORNEY BUCHALTER:** All right.

24   **PRESIDING COMMISSIONER PEREZ:** This

25  particular letter was authored by Raymond H.

26  Peaby, P-E-A-B-Y, captain of the homicide unit

27  from the sheriffs department, county of Los

45

1   Angeles.   And in the letter they outline some of

2   the details of the offense.   Which have already

3   been read into the record.   And in the letter

4   they state that in response to this offense, Mr.

5   Clark claims self defense.   It is the opinion of

6   this department that inmate Clark's exhibition

7   of uncontrolled rage constitutes a continued

8   threat to others.   Based on these facts the

9   parole of inmate Clark is not appropriate and

10   should be denied.

11        **DEPUTY COMMISSIONER COX:**   And I will not

12   for the record counsel that is very close in

13   content that was in the file from December 16,

14   1996.   So there is not a lot of new information

15   provided in this letter that wasn't available to

16   you at the time of the review of the file.

17        **PRESIDING COMMISSIONER PEREZ:**   And with

18   that I will ask Commissioner Cox to cover post

19   conviction factors.

20        **DEPUTY COMMISSIONER COX:**   Thank you.   It

21   looks like the last actual hearing that Mr.

22   Clark actually attended was back on January 31,

23   1997 at which point he was given a four-year

24   denial January 3, 1997.   And then there was in

25   November 28, 2001 there was a three-year

26   stipulation by Mr. Clark.   And that was

27   programming inadequate and needs to attend AA,

1   needs to work on parole plans and that was

2   signed by Mr. Clark and his counsel as well as

3   the commissioner and deputy commissioner at the

4   hearing.  On February 10, 2005 it says CC one

5   Rodriguez informed me that my attorney can't

6   make it on the date of the hearing and I need to

7   postpone my hearing for another date.  And that

8   was certainly granted as a reason for

9   postponement.  That brought us today when your

10  attorney was available.

11      **ATTORNEY BUCHALTER:**  What date was that you

12  just read?

13      **DEPUTY COMMISSIONER COX:**  That one was

14  February 10th.

15      **ATTORNEY BUCHALTER:**  That is certainly an

16  error.

17      **DEPUTY COMMISSIONER COX:**  There was

18  February 10th that the thing was signed.  Says

19  that CC one Rodriguez informed me that my

20  attorney cant make it on the date of the

21  hearing, I don't know what date the hearing was

22  supposed to be.  The date of the hearing wasn't

23  February 10th.

24      **ATTORNEY BUCHALTER:**  I know the hearing was

25  scheduled for February 24th, I would like to

26  clarify that Commissioner.

27      **DEPUTY COMMISSIONER COX:**  Sure.

1      **ATTORNEY BUCHALTER:**   That has been a real

2    issue with me.   I received a telephone call from

3    the board of prison terms and the person, the

4    messenger was Joyce Lumpkin.   And she telephoned

5    me prior to that, and my client didn't know and

6    she told me that the board, and I am going to

7    find out who directed that, planned to postpone

8    this hearing and I had no choice in the manner

9    for a new psych report.   And so I said I have no

10    choice and she said no.   The board wants to do

11    that so what happened later, several weeks later

12    I get a phone call saying I think they made a

13    mistake.   Now I guess I don't know why someone

14    down here put in the fact that I had in fact

15    postponed the hearing.   I number one don't have

16    the authority to order a new psych report I have

17    absolutely zero authority to that, only the

18    board has the authority to do that.   I did not

19    make that postponement, I was ready to come down

20    here and have this hearing.   Now somehow,

21    someone down here put a detail in that I

22    personally had postponed the hearing, that was

23    absolutely a lie and incorrect.   Informed my

24    client who was very angry with me that I had

25    postponed the hearing that was incorrect, I did

26    not and that finally got cleared up.   So that is

27    why he signed that, he thought I had, he was

48

1   certainly very upset about that.  I did not and

2   that is why I want that corrected.  Because I

3   did not postpone that hearing.

4        **DEPUTY COMMISSIONER COX:**  This is the

5   transcripts I wasn't here so I am not going to

6   correct it.

7        **ATTORNEY BUCHALTER:**  I know you are not,

8   but I am saying I did not do that, the board

9   ordered that.  Months passed by he did not get a

10  new psych report and suddenly there is a

11  miscellaneous detail that ordering a new psych

12  report which we have already discussed and is

13  not a part of this hearing particularly.  So I

14  want the record to be very clear that I didn't

15  postpone that hearing.

16       **DEPUTY COMMISSIONER COX:**  And I don't know

17  where the information came from but that is

18  where we stand today.  So really we are going

19  back to 1997 because that was the last time

20  anyone was actually met with Mr. Clark in a

21  hearing.

22       **ATTORNEY BUCHALTER:**  Right.

23       **DEPUTY COMMISSIONER COX:**  In both 1997 and

24  2001 the board did write that they wanted him to

25  remain disciplinary free and to attend self help

26  and therapy and more recently developed parole

27  plans was one of the listed in 2001.  In looking

49

1  over his disciplinary record he has been
2  disciplinary free since 1990, in terms of CDC
3  115's he had only a total of three during his
4  incarceration. 1989 for inmate manufactured
5  alcohol, 1989 for refusing a direct order, and
6  his last one was for failing to report. He has
7  a total of 11 CDC 128's. The last of those
8  being on May 15, 1996. And those generally
9  involve institution count, direct orders, absent
10 from his assignment, absent from his assignment.
11 There were a couple in here that concerned me
12 and it only concerns me because it has to do
13 with his work. And we will go over those, I
14 think those may have been the last two he may
15 have actually received. One was, August 11,
16 1994, he received one and this was from the
17 bakery. And this actually ended up in and it
18 says in one of the reports that he was fired
19 from the bakery. And this actually did happen
20 and the report indicates that what happened was
21 Mr. Clark and the bakery supervisor had a
22 discussion where in Mr. Clark was told to, he
23 was asked to help transfer bread from the
24 cooling racks to shipping. He said that job has
25 to be done by the slicing crew not me. I then
26 told Clark I tell you what to do, you don't tell
27 me what to do. Clark says fuck you, I said what

50

1   did you say, he said you heard me fuck you.

2   Now, so he told me to punch out you are fired.

3   So Mr. Clark's benefit Mr. Clark then came back

4   to the supervisor and said I would like to

5   apologize to you.  The supervisor said I am not

6   accepting your apology.  Mr. Clark said why wont

7   you accept my apology?  Because you said it

8   twice and you knew what you were doing all along

9   so get out of my bakery.  So he was fired from

10  the bakery.  But to his credit he did attempt to

11  resolve that issue without it becoming what it

12  was.

13          **ATTORNEY BUCHALTER:**  Was that 128?

14          **DEPUTY COMMISSIONER COX:**  That was a 128.

15  And then had another, and the only reason I am

16  bringing these up is because the resulted in him

17  being removed from positions that we will be

18  talking about later.  He had been found with

19  powdered soap in his possession as he was

20  leaving the kitchen, and they removed him from

21  the kitchen because he had powdered soap that

22  belonged to the kitchen I suppose.

23          **INMATE CLARK:**  Excuse me, Ms. Cox, they

24  never removed me from the assignment they just

25  did the 128.

26          **DEPUTY COMMISSIONER COX:**  So you stayed in

27  the kitchen on that one.

51

1        INMATE CLARK:  Right, yes.

2        DEPUTY COMMISSIONER COX:  And then the last

3   one was because he had a tumbler and he had

4   altered it by etching a drawing of a female on

5   the tumbler, so they wrote a 128.  But his

6   disciplinary history is certainly not a major

7   issue at this point and time.  In terms of his

8   education, he did in fact get a high school

9   diploma from Folsom in 1988.  And then he did

10  attend some college courses, and we have a

11  certificate that he was able to provide us.

12  College course was a t Southwestern College here

13  in Chula Vista and it indicates that he has

14  completed a course in history 101, western

15  civilization.  And that was in the summer of

16  1989.  He also had on his file, two certificates

17  from the school of paralegal studies.  Both are

18  dated August 6, 1993 and reflect that he had

19  completed paralegal specialties in litigation

20  and real estate law.  This is a correspondence

21  course that appears to out of Atlanta Georgia,

22  correct?

23        INMATE CLARK:  Yes.

24        DEPUTY COMMISSIONER COX:  Regarding his

25  vocational efforts he, I show a certificate for

26  completion of upholster and that was in July 1,

27  1993.  And then he had completed 700 hours in

52

1  the landscaping vocation and that was done of

2  March 1, 1989.  I also when reading the report

3  they had listed that you had other skills I

4  noticed that I read about welding.  And it said

5  you had some skills in welding but I could never

6  find any actual certification.

7      **INMATE CLARK:**  Right, yes.  The only thing

8  I have in my file are the work progress reports

9  from the welding vocational.

10     **DEPUTY COMMISSIONER COX:**  Did you ever

11  certify in that trade?

12     **INMATE CLARK:**  No.

13     **DEPUTY COMMISSIONER COX:**  Ok, then they had

14  down watch repair.  I didn't find anything on

15  watch repair.

16     **INMATE CLARK:**  Wow, I don't doubt it.

17     **DEPUTY COMMISSIONER COX:**  Nothing there.

18     **INMATE CLARK:**  All I have from that is

19  probably the time cards that shows that I was

20  there and showed up into the course.

21     **DEPUTY COMMISSIONER COX:**  And did you

22  finish that course?

23     **INMATE CLARK:**  No.

24     **DEPUTY COMMISSIONER COX:**  And then small

25  business machines?

26     **INMATE CLARK:**  I didn't finish that either

27  I just took a few of the courses they had and

53

1   learned how to repair a typewriter.  That was

2   it.

3       DEPUTY COMMISSIONER COX:  And then I did

4   notice you have a certificate for participation

5   in a class resulting in you receiving it for the

6   Brother EM601 typewriter and that was in 1994.

7       INMATE CLARK:  That was the typewriter one,

8   yes.

9       DEPUTY COMMISSIONER COX:  Now, you have the

10  upholstery and you have the landscape

11  (indiscernible).  Correct?

12      INMATE CLARK:  Yes.

13      DEPUTY COMMISSIONER COX:  You also have

14  some welding skills.  What would it take for you

15  to actually complete a welding trade, where you

16  were certified in that trade?

17      INMATE CLARK:  Well I would have to

18  practice a lot first for it.  What they were

19  doing here at one time was Los Angeles

20  certification for structural steel and that is

21  what I was going for, but I figured I should

22  just not even bother to go along with that until

23  after I get released if I wanted to stay in

24  welding.  What had happened is I had some sinus

25  problems with the smoke and I was getting

26  nosebleeds.

27      DEPUTY COMMISSIONER COX:  So welding may

54

1  not even be a legitimate trade for you based on

2  your health?

3      **INMATE CLARK:**  Yah, I had some problems

4  with the smoke.

5      **DEPUTY COMMISSIONER COX:**  I also noticed

6  that in your work, the work assignments I looked

7  over you had been in air conditioning repairs.

8  There was something in maintenance.

9      **INMATE CLARK:**  I did that with my

10  supervisors that I had when I worked over in the

11  kitchen.  I worked in the maintenance there.

12      **DEPUTY COMMISSIONER COX:**  Are you able to

13  do air conditioning and refrigerator repair on

14  your own?

15      **INMATE CLARK:**  No.

16      **DEPUTY COMMISSIONER COX:**  So you would need

17  to develop additional skills to actually rely on

18  it.

19      **INMATE CLARK:**  Right, yah well I could

20  assist somebody but that is about it.

21      **DEPUTY COMMISSIONER COX:**  Ok, it also said

22  you were involved in pumps, ovens and

23  refrigeration.  That must have been in the

24  kitchen as well?

25      **INMATE CLARK:**  Yes.

26      **DEPUTY COMMISSIONER COX:**  And then it says

27  on one four seven four, rum CEP, maintenance of

1  CEP.

2      **INMATE CLARK:**  Right, Central Energy Plant.

3      **DEPUTY COMMISSIONER COX:**  And what do you

4  do there?

5      **INMATE CLARK:**  Help maintain turban engine

6  and the steam generation plant.

7      **DEPUTY COMMISSIONER COX:**  Ok, I would

8  imagine that requires some kind of skill?

9      **INMATE CLARK:**  Yah, it is pretty intense.

10      **DEPUTY COMMISSIONER COX:**  So are you, are

11  you sufficient in doing that on your own, or are

12  you required to just be an assistant.

13      **INMATE CLARK:**  There are a few things I can

14  do on my own, as far as maintenance but I

15  couldn't troubleshoot and repair problems on my

16  own.

17      **DEPUTY COMMISSIONER COX:**  What would it

18  take for you to learn how to do that kind of

19  thing?  Just continue doing the assignment?

20      **INMATE CLARK:**  Probably more than that.

21      **DEPUTY COMMISSIONER COX:**  Do you have to go

22  to some school?

23      **INMATE CLARK:**  I would have to be

24  certified.  My supervisor that I work for is

25  certified by the manufacture of the generator.

26      **DEPUTY COMMISSIONER COX:**  Ok, so that is

27  not even a possibility.

56

1       **INMATE CLARK:** Not at this time, no.

2       **DEPUTY COMMISSIONER COX:** Not at this time.

3   So we are looking at upholster and landscaping

4   being your trades basically. Then I went to

5   self-help and I was very concerned as I said in

6   1997 the said more self help and in 2001 on the

7   stipulation they said that. And I noticed that

8   really the last time that you participated in

9   self-help in regards to any kind of substance

10  abuse, and that is a big issue because you were

11  drinking the day of the commitment offense, was

12  in 1995. And it was very brief in 1995. In

13  fact it has been very brief all along that you

14  have participated in any kind of AA or NA

15  substance abuse treatment.

16      **INMATE CLARK:** Yah I had some chrono's in

17  my file from, mostly from DDI, for about a year

18  I was attending AA and NA. As for what I have

19  done here, I think you are holding the

20  certificate there for --

21      **DEPUTY COMMISSIONER COX:** This is the

22  advance life plan for recovery and that was in

23  1995 that was the last if found.

24      **INMATE CLARK:** Right that was the last,

25  that was the last time.

26      **DEPUTY COMMISSIONER COX:** Now Mr. Clark I

27  guess my concern is when the board says to you

57

1  we really think that substance abuse is a major

2  issue and was a major issue.  Even though you

3  haven't had any alcohol things in the

4  institution since 1990.  When they say to you we

5  think this is a major issue and the Doctors say

6  that if you relapse back into alcohol or drug

7  use it would raise your level of violence or

8  your potential level of violence.  Is there some

9  reason that you just will not go to those

10  programs?

11      INMATE CLARK:  No, there is the only reason

12  is I don't go there, when I go in there I just

13  at here in the dining hall, I cant understand

14  what people are saying.

15      DEPUTY COMMISSIONER COX:  So all of them

16  are held in the dining hall?

17      INMATE CLARK:  Most of the time yes.

18      DEPUTY COMMISSIONER COX:  Have you ever

19  thought about going over to the medical

20  department and indicating them that you may have

21  some hearing difficulty?

22      INMATE CLARK:  Yes.

23      DEPUTY COMMISSIONER COX:  And what have

24  they done?

25      INMATE CLARK:  They did a hearing test on

26  me and it concluded that I have some hearing

27  loss in my left ear.

58

1     **DEPUTY COMMISSIONER COX:**  Have they even

2   addressed that issue?

3     **INMATE CLARK:**  No, I don't think so.  It

4   doesn't appear they will.

5     **DEPUTY COMMISSIONER COX:**  Is there ever an

6   opportunity to do these meetings in something

7   besides a dining hall?

8     **INMATE CLARK:**  Oh yes, it in the AA program

9   it states all it takes is two or more people to

10   have a meeting, so I have talked to people

11   before about AA but there is nothing to show in

12   the file for any of that.

13     **DEPUTY COMMISSIONER COX:**  Ok, in 1995 I

14   think it was, I read something that said you

15   were working on your moral inventory.

16     **INMATE CLARK:**  Yes.

17     **DEPUTY COMMISSIONER COX:**  Did you ever get

18   any farther than that?

19     **INMATE CLARK:**  No not really.

20     **DEPUTY COMMISSIONER COX:**  What did you put

21   on your moral inventory?

22     **INMATE CLARK:**  I haven't done anything at

23   all.

24     **DEPUTY COMMISSIONER COX:**  Doesn't it

25   concern you that you know you talked about your

26   friend your mom said he had the business but

27   fell back into alcohol.

59

1       INMATE CLARK:  Yah right.

2       DEPUTY COMMISSIONER COX:  Doesn't that

3   concern you that, that could happen?

4       INMATE CLARK:  Oh yah, it concerns me that

5   it does happen with a lot of people.

6       DEPUTY COMMISSIONER COX:  Ok, doesn't it

7   concern you that it could happen to --

8       INMATE CLARK:  It does concern me that it

9   could happen to me yes.

10      DEPUTY COMMISSIONER COX:  So what are you

11  doing to address that issue?

12      INMATE CLARK:  I just say no.

13      DEPUTY COMMISSIONER COX:  I know there is

14  pruno out there and --

15      INMATE CLARK:  Oh yah.

16      DEPUTY COMMISSIONER COX:  But you walk in

17  every grocery store in America, and there is all

18  this alcohol lining the shelves, tough to say

19  no.  A lot tougher to say no out there.  So how

20  do you address the issue, if we let you out how

21  do you walk down the isle at Safeway among all

22  the bottles of alcohol that are available, all

23  the cases of beer that are available to drink

24  how do you say no.  And how do you know you can

25  say no when you are not attending any programs.

26      INMATE CLARK:  I feel that I can say no,

27  really I do.  I have done it here, I have no way

1  of proving that people have stuck a tumbler in

2  front of me and said hey drink up here it is.  I

3  can smell the alcohol and I just have to leave.

4  I have to walk away.  It is hard, like you said

5  it is, it is not easy.  And that is just what I

6  have to do.

7      **DEPUTY COMMISSIONER COX:**  You think that

8  you could do that out there in the free

9  community?

10     **INMATE CLARK:**  I am ready to give it a try,

11  yes.

12     **DEPUTY COMMISSIONER COX:**  I still think you

13  need to be addressing that issue a lot more than

14  you are.  I didn't find any laudatory chrono's

15  in the file during this period of time.  Do you

16  have nay other chrono's or certificates to give

17  me that were not in this packet here?

18     **INMATE CLARK:**  No.

19     **DEPUTY COMMISSIONER COX:**  Ok, your board

20  report there was an update that said absolutely

21  nothing by CC one Rodriguez.  The other board

22  report was for the February calendar.  Were you

23  satisfied with that report?

24     **INMATE CLARK:**  Yes.

25     **DEPUTY COMMISSIONER COX:**  Did you have a

26  chance to read it?

27     **INMATE CLARK:**  Yes.

1      **DEPUTY COMMISSIONER COX:**  Anything in that

2   report that you think needs to be corrected with

3   regards to post convictions?

4      **INMATE CLARK:**  No.

5      **DEPUTY COMMISSIONER COX:**  We will go to the

6   psychiatric report, this is a report that was

7   prepared for the September 2001 calendar.   It

8   noted that it was actually dictated and written

9   typed on August 16, 2000.  So it is about five

10  years old.   The doctor, and this is Doctor T.R.

11  Robertson, MD, staff psychiatrist, goes through

12  identifying information, your education, etc.

13  He notes that under employment history that you

14  have worked for a repairman on the refrigeration

15  equipment in the central kitchen.  You get a

16  long fairly well in your current job.   He is the

17  one that noted that you had been fired from the

18  PI bakery for insubordination and you were

19  caught stealing soap from the kitchen.   Under

20  substance abuse he states that you experimented

21  with marijuana at the age of 14 and began

22  drinking at the age of 15.   You had difficulty

23  with military authority, because of you're

24  drinking, drinking on duty and had several

25  disciplinary actions in the army.   You

26  participated in an inpatient alcoholism

27  treatment program while in the army at Fort

62

1    Lewis Washington.  And of course we know why

2    historically that did not sink in.  Because you

3    still drank after you got done with that

4    treatment program.  Under psychiatric and mental

5    history he indicates that the diagnosis, he says

6    you deny ever having any psychiatric treatment

7    but the diagnosis on all of your previous

8    reports including alcohol abuse or dependence

9    institution remission coupled with an x is two

10   diagnosis of anti social personality traits.

11   Under his diagnosis he indicates that he puts

12   alcohol dependence in institution remission,

13   anti social personality traits (indiscernible)

14   with time.  But sporadically evident during

15   incarceration since 1986.  He gives you a GAF

16   score of 70.  And notes that your social

17   judgment appears to be intact within the

18   institution setting.  It is probable that

19   alcohol consumption on his and the victims part

20   was a very significant contributing factor.

21   Without this factor it is doubtful the crime

22   would have taken place.  Under assessments of

23   dangerousness, doctor rights that within a

24   controlled setting this inmate is probably less

25   dangerous than the average inmate.  If released

26   in the community, this would probably be

27   maintained but the significant risk factors

63

1  related to alcohol use would remain and pose a

2  significant unpredictable variable.  The inmate

3  has a significant history of alcoholism prior to

4  his life crime.  At the time of the crime he and

5  the victim had both been drinking excessively

6  and this contributed to the ultimate crime.

7  Currently he admits to a vague understanding of

8  this.  That alcohol is related to the life

9  crime, he admits a vague understanding of this

10  but does not feel that participation within the

11  prison setting in AA, NA or other self help

12  groups is worth the trouble.  The probability

13  that a similar event would occur is quite low

14  but in light of history of alcoholism and

15  failure to profit from experience it is not

16  zero.  Did you have a chance to read that

17  report?

18      **INMATE CLARK:**  Yes.

19      **DEPUTY COMMISSIONER COX:**  Ok and do you

20  have any comments that you wish to make with

21  regards to the doctors statements?

22      **INMATE CLARK:**  No.

23      **DEPUTY COMMISSIONER COX:**  All right then I

24  will give it back to the chair.

25      **PRESIDING COMMISSIONER PEREZ:**  Sir earlier

26  when I was viewing your personal factors with

27  you I asked you if you felt you were ever

64

1   addicted to any substance.  And you indicated
2   that you had not.  Yet your file is complete
3   with information that would attest that you were
4   dependant on alcohol.  Is that accurate sir?

5       INMATE CLARK:  Yes I misunderstood your
6   statement when you said substance, I should have
7   said yes but I thought you meant other narcotics
8   substances.  You didn't state that but that is
9   what I thought.

10      PRESIDING COMMISSIONER PEREZ:  Ok, thank
11  you.  I just wanted to clarify that with you.  I
12  do note for the record that when you were
13  discharged from the service it was not, it was a
14  general discharge.  Not honorable conditions, is
15  that because of the issues that you had in the
16  service with alcohol abuse?

17      INMATE CLARK:  Yes.

18      PRESIDING COMMISSIONER PEREZ:  Ok and I do
19  want to clarify one other thing, I indicated to
20  you that your personal factors indicate that you
21  had a history of extensive use of marijuana and
22  experimentation with cocaine.  You indicated
23  that you did not have a history of extensive use
24  of marijuana.  But yet in your 1997 hearing when
25  you were asked the exact same question, you said
26  yes that was accurate.

27      INMATE CLARK:  I misunderstood.

65

1      **PRESIDING COMMISSIONER PEREZ:**  Ok so it is

2   inaccurate, you did not have an extensive use

3   history, please let me finish, so you did not

4   have an extensive use of marijuana or cocaine?

5      **INMATE CLARK:**  No.

6      **PRESIDING COMMISSIONER PEREZ:**  So that was

7   an error, you misunderstood that back in 1997

8   when you were asked that question?

9      **INMATE CLARK:**  Yes.

10      **PRESIDING COMMISSIONER PEREZ:**  Ok, and you

11   were under the influence of alcohol at the time

12   the offense was committed?

13      **INMATE CLARK:**  Right yes.

14      **PRESIDING COMMISSIONER PEREZ:**  Ok, how much

15   had you drank?

16      **INMATE CLARK:**  I have no idea exactly how

17   much.

18      **PRESIDING COMMISSIONER PEREZ:**  Ok, how many

19   years prior to the commitment offense do you

20   believe you had been drinking alcohol

21   excessively?

22      **INMATE CLARK:**  Probably three or four at

23   least.

24      **PRESIDING COMMISSIONER PEREZ:**  On a regular

25   basis?

26      **INMATE CLARK:**  Not everyday.

27      **PRESIDING COMMISSIONER PEREZ:**  Not

66

1  everyday.

2       **INMATE CLARK:**  But I drank sometimes I

3  would drink excessively.  That where I admit at

4  times I was excessive with my drinking.  I

5  definitely wasn't a social drinker.

6       **PRESIDING COMMISSIONER PEREZ:**  Ok, thank

7  you.  At this time I would like to give the

8  Deputy District Attorney the opportunity to ask

9  questions through the chair please.

10      **ATTORNEY MORRISON:**  Has the inmate ever

11 lied to a parole panel?

12      **DEPUTY COMMISSIONER COX:**  You mean

13 intentionally lied?

14      **PRESIDING COMMISSIONER PEREZ:**  Have you

15 ever intentionally lied --

16      **DEPUTY COMMISSIONER COX:**  Not just a

17 misunderstanding.

18      **INMATE CLARK:**  No.

19      **ATTORNEY MORRISON:**  Has the inmate ever

20 lied to a psychologists or a counselor preparing

21 a report for a parole panel?

22      **INMATE CLARK:**  No.

23      **ATTORNEY MORRISON:**  Nothing further thank

24 you.

25      **PRESIDING COMMISSIONER PEREZ:**  Counsel do

26 you have any questions for your client?

27      **ATTORNEY BUCHALTER:**  No questions.

1    **PRESIDING COMMISSIONER PEREZ:**   Do you have

2    any questions?

3    **DEPUTY COMMISSIONER COX:**   No.

4    **PRESIDING COMMISSIONER PEREZ:**   Sir let me

5    ask you one question, what insight have you

6    developed during these last 20 years of

7    incarceration that should make this panel feel

8    comfortable that you would not commit a crime of

9    this nature or any crime were you to be

10   released.

11   **INMATE CLARK:**   Well I don't know I haven't

12   looked at it as insight but I reflected a lot on

13   the damage I did to people I knew.   And for what

14   I did to their family member, their friend and

15   my friend too.   He was my friend, and how it has

16   affected not just my life but others, I really

17   made a mess for the victims family that cared

18   about him and loved him and how I sort of just

19   destroyed that.   And I wouldn't want to do

20   something like this to a human being again.   I

21   wouldn't want to do this ever.   And I regret

22   that I did it.   And as it has been stated I

23   accept responsibility for what I did to my

24   friend.   And it was horrible that I did this.

25   And so I have never complained about being here

26   to do this punishment because I feel I deserve

27   it.   And I wont argue that I got what I deserved

68

1   here to be put into prison. And I am very

2   remorseful and that is about all I have to say.

3       **PRESIDING COMMISSIONER PEREZ:** Thank you

4   sir. Sir would you mind giving him some tissue

5   please. Thank you. At this time we would like

6   to give the Deputy District Attorney the

7   opportunity to make his closing statement.

8       **ATTORNEY MORRISON:** Thank you. It is hard

9   to top the inmates last statement that he

10  deserves to be here in prison. He is here

11  because of the horrible vicious premeditated act

12  that he committed. Although this was a second-

13  degree murder conviction on a certified plea,

14  the facts show that it was in fact premeditated.

15  He made pre offense statements that he intended

16  to kill the victim. He was observed to be

17  sharpening both a knife and an axe ahead of

18  time. The attack consisted of 20 some stab

19  wounds, four of which were fatal, in varying

20  degrees the evidence shows that he rolled the

21  victim over and continued stabbing him on both

22  sides of the torso and there were numerous

23  incisive blows also. The knife he was using

24  apparently wasn't adequate because it broke

25  during the attack and the inmate went inside and

26  got another weapon to continue the fatal attack.

27  So clearly he had an opportunity to cease break

69

1  off the attack.  In possibility determine the

2  orders of the blows so the fatal ones had

3  already been delivered.  But he did not cease

4  when he had an opportunity, a clear opportunity.

5  He outweighed the victim by some 50 pounds.  He

6  has previously claimed self-defense, that the

7  victim had a knife and he took it away from him

8  and just stabbed him, plus loosing control

9  because he was drunk.  In 1995, when he was

10  asked about this, he told the board that he was

11  not fearful in a serious sense.  Thereby

12  negating his own previous statements of self-

13  defense.  This sounds like he was mad at the

14  victim, he was going to kill him, and he did.

15  And alcohol was a major contributing factor, it

16  took place in a bar where the victims being

17  (indiscernible) loosing money to the barmaid.

18  They hadn't been in a bar when this happened to

19  start, the inmates has never addressed that.

20  Inmate has totally failed to understand the

21  causing factors and stresses leading to this.

22  He has been told in a documentation here attend

23  AA and NA, at his initial hearing in 1995,

24  attend AA and NA.  1997, attend AA and NA, get

25  parole plans and letters of support.  At the

26  1997 hearing he admitted the victim was face

27  down and groaning and he continued to stab him

1  in the back, but that doesn't explain the

2  deepest stab wounds to the front of the abdomen.

3  And a witness had indicated that, the witness

4  saw the inmate turn the prone body of the victim

5  over and kept stabbing.  Apparently at that

6  hearing there was a discussion with the inmate

7  and he wanted to go to therapy so he could find

8  out who else killed the victim.  Thereby laying

9  off some third party guilt which is totally

10  ridiculous.  Most telling and I was quite

11  frankly appalled, I wrote it down immediately

12  hope I got it accurately the transcript has it

13  in board, since we couldn't talk about the

14  offense the chair opened by asking him how he

15  feels about it.  He said it was a horrible

16  mistake, excuse me a horrible mess.  And I was

17  appalled by that, thinking he must have just

18  been thinking, it was a bloody mess from all of

19  these stab wounds.  And then he went on to say

20  it was a big mistake and then he gave the usual

21  platitudes that most inmates state, filled with

22  remorse, etc., etc.  It doesn't ring true at

23  all.  He just doesn't get it, the Deputy

24  Commissioner discussed with him, he'll just say

25  no, but he has no training, no tools which to

26  deal with the problems of alcohol on the

27  outside.  As is noted the army booted him out,

1   essentially because he couldn't do his duties.

2   We weren't at war at that time it is critical as

3   it is today, but he said he got a DUI,

4   endangering himself and I believe he said he was

5   driving on the base, that is why he went to the

6   alcohol program.  As the Deputy Commissioner

7   noticed it didn't work.  The latest

8   psychological report is not favorable do to his

9   lack of programming in this area, which is most

10  critical.  He is not deserving of a parole date

11  today, and as far as second degree murder this

12  is a particularly gregious one due to the

13  vicious, calculated, repeated stab wounds and

14  incisions he made.  So it is even more egregious

15  crime than the average second-degree murder and

16  he is undeserving of a parole date.  Based on

17  his demonstrated which can only be considered

18  willful refusal to comply with board

19  recommendations it is unlikely that he is going

20  to be ready for parole for another three years

21  at least.  Thank you.

22      **PRESIDING COMMISSIONER PEREZ:**  Thank you.

23  Counsel your closing statement please.

24      **ATTORNEY BUCHALTER:**  Thank you.  The

25  sheriff and the District Attorney have asked you

26  to definitely deny my client a parole date based

27  on the facts of the offense.  The facts of the

72

1   offense are what they are, and this past year

2   President Bush has publicly stated that we are a

3   nation of second chances and that is why we have

4   a parole system.  And Governor Schwarzenagger

5   and the LA Times on March 27th commented that by

6   insisting that California make rehabilitation

7   the focus of prison life, the times said,

8   Governor Schwarzenagger is joining a national

9   movement of political leaders that believe it is

10  time for a new approach to incarceration.  And

11  statistical studies have proven that inmates

12  given life sentences with parole possibility

13  have an extremely low rate of re offending after

14  release.  And this hearing is about that, it is

15  about his reentry into society.  The facts of

16  the crime happened all those many 20 years ago

17  and his rehabilitation we are here about today

18  and that is what the political leaders want,

19  because tax payers are picking up a heavy

20  expense for prisoners that are kept in and are

21  no longer a danger to society.  He paid his debt

22  to society by his mandatory eligible sentence,

23  which ended on December of 1995.  That was the

24  time he was mandated to pay a debt back to

25  society for what he did.  And he has talked

26  about the payment that he did to serve that and

27  he did pay that.  And now it is about

73

1   rehabilitation, some nine and half years later
2   we are here about the life offense happened and
3   now we are here about his rehabilitation.   And
4   the question to be answered is he a danger to
5   society or not, and no one particular factor
6   will tell you that no he is not.   He has been
7   sober now for a very long time.   Financially he
8   has a trust account and he has close to 60,000
9   dollars available to him, his own private funds
10  on his exit.   He can live with his mother at no
11  expense, she also commented that she will
12  provide all his needs, residence,
13  transportation, food, clothing, financial
14  whatever.   Including other family members who
15  also said they would be extremely supportive of
16  him.   So his parole plans are in order and
17  whether he has a job offer of not is not a
18  criteria for suitability or unsuitability at all
19  and he doesn't need a job when he exits.   He has
20  all the financial support he needs to take his
21  time to get the appropriate job for himself, if
22  that is what he wants to do.   In the mean time
23  he can afford to support himself for a very long
24  time.   Certainly his military service speaks
25  well for him, he did serve three years in 1978
26  and he had a military tour in Korea and a
27  general discharge under honorable conditions

74

1   also. And that is to be noted. In his priors a
2   great deal was talked about his priors, he had
3   three misdemeanors, non violent. And these
4   misdemeanor priors all of those years ago, one
5   of them was juvenile vandalism where he threw a
6   bottle through a window of a building that was
7   unoccupied, it was 28 years ago. In 1978, 27
8   years ago he had a misdemeanor and in 1980 35
9   years ago this was his last one, and these
10  misdemeanors that were not violent are really
11  insignificant to use as any kind of prior
12  criminality resulting in an escalating pattern
13  of violence. The title 15 of the Penal Code
14  certainly required much more than that for it to
15  be considered and held against him as prior
16  criminality. That was significant this is
17  insignificant and certainly misdemeanors were
18  not included, I don't believe in the
19  contemplation of that. His disciplinary actions
20  also, in the prison institution, nothing since
21  1990 for the 115's the manufacturing of alcohol.
22  He has been, he hasn't had any intoxicants since
23  that date. That is a very long time ago, 15
24  years to be exact. And no 115's since that time
25  also. So 15 years ago for manufacturing
26  alcohol, a non-violent crime, and also been
27  sober and not had alcohol is excellent. The

75

1   128's that were talked about the powdered soap

2   that belonged to the kitchen, the f-u, the fuck

3   you said twice then made an apology for it.  He

4   got a 128 a but that Smith Case mandates that

5   128a's cannot be used as unsuitability factors

6   they are insignificant and do not rise to the

7   level of something that you can use to deny him

8   parole.  That cannot be used against him.  And

9   the only 115 he has got against him was in 1990

10  and was a non-violent crime also.  You have

11  talked about the certificates he has, he got on

12  the outside, the upholstery certificate he has a

13  lot of landscaping experience, 700 hours to be

14  exact.  Also machinery, other things paralegal

15  courses he has taken, he has educated himself

16  with some southwestern College classes also.

17  And the self-help you talked about or that he

18  had done alternatives to violence and the

19  advanced course in that also.  Barriers he took

20  in 1992, the American program which involved

21  responsibility of self and determination program

22  he has also had.  So he has had a lot of self

23  help to bring him to this point and time.  Where

24  now his sojourn in prison just depended on

25  whether or not he poses a risk of harm to

26  others.  In the life offense he did take

27  responsibility at a early stage.  He did plead

76

1   guilty.  And the Biggs case also mandates that
2   the commitment offense just cannot be used
3   repeatedly as the sole reason for a denial of
4   crime, or parole pardon.  They (indiscernible)
5   which is why we are here.  The psychologist
6   talked about his violence potential and he did
7   talk about and was read into the record already,
8   that the risk factors are related to alcohol
9   abuse if he uses he would be significant and
10  unpredictable variable but not necessarily.  But
11  he also talked about how he has a low risk for
12  use again as a matter of fact.  You read into
13  the record that his risk is quite low but not
14  zero.  Nothing can ever be zero, Commissioners
15  so if you wait for a doctor to say his risk now
16  is zero for use of alcohol then we are going to
17  forever for everybody as that is not a
18  possibility.  So the fact that he gives him a
19  low risk for usage and for re offending is an
20  excelled assessment and is favorable for parole,
21  is not unfavorable for parole it is quite the
22  contrary for a matter of fact.  Because we can
23  never guarantee zero but what is the probability
24  and the doctor said quite low as a matter of
25  fact.  So he talked about his gains, that put
26  him in the low dangerousness, he is lower than
27  the average inmate and he can hold all his gains

1   on the outside also as long as he stays sober.

2   And he has been sober now for about 15 years I

3   believe.  So that certainly is a predictor of

4   his future behavior.  And the fact that this

5   report is four years old or five years old even

6   is insignificant because it is still relevant to

7   today's hearing since the regulations do not

8   require a current psychological report also.

9   The substance abuse which is important obviously

10  he has handled substance abuse history, one does

11  not have to attend AA or NA in order to be free

12  and be guaranteed or have a better guarantee of

13  non-use you don't have to have to.  He has shown

14  he can do without that and in fact there is a

15  federal decision in Turner vs. Hickman I can

16  give you the site if you like.  It is a 2000

17  court case I believe that does not require any

18  inmate to participate in AA or NA as a matter of

19  fact because it is a faith based program and it

20  would probably be against the law to do that.

21  So he doesn't have to do that in order to be

22  successful on the outside.  And in order to

23  continue his sobriety which he has talked about

24  and he has talked about his commitment to that,

25  he realizes that his success does rest on that.

26  And a 15 year absence from any alcohol or drug

27  abuse is certainly significant, I mean people go

78

1    to AA and they re offend in three years or one

2    month, or three days, that is no guarantee

3    either.  It is no more of a guarantee, in fact I

4    would think that 15 years of non use is much

5    more of a guarantee than about anything else

6    that he could bring to this board.  And anyway

7    the mandate cannot be made that he attend AA

8    anyway, he can do it all by himself and like he

9    said he does talk to the people about it.  It is

10   not recorded because he goes in like he said two

11   people can be an AA meeting and he does that.

12   There is no record of that but that is what he

13   does and he swore to tell you the truth and I

14   believe him totally and completely.  I believe

15   that everything adds up to one conclusion and

16   that is he took a plea bargain with an

17   expectation of after he served so many years up

18   to 1995, then when he is no longer a danger he

19   is entitled to go home.  As a tax payer, I would

20   like to see him go home and I wouldn't like to

21   have to pick up his tab anymore and I do believe

22   that he has made a showing today that he is in

23   fact suitable for parole.  He is not a danger to

24   society, he is not going to go out and reuse

25   alcohol and re offend.  He talked about his

26   remorse and his feelings, the District Attorney

27   talked about how he just said that it was a mess

1    and a mistake. And at the last question you

2    asked Commissioner, which was excellent, and he

3    did speak to that last question and he talked

4    about the mess. He said he made a mess for

5    those families, that probably was his intention

6    the first instance but he didn't clarify it.

7    Later on he clarified that. He talked about his

8    remorse and the pain that he caused and his

9    insight into what happened. The insight is

10   clearly related to drinking he was doing at that

11   time. Which he hasn't done for 15 years and

12   that sobriety tells volumes for his success on

13   the outside. I would ask that you give him a

14   parole date today, I think he richly deserves

15   it.

16        **PRESIDING COMMISSIONER PEREZ:** Thank you.

17   Sir this is your opportunity to provide a

18   statement to the panel to why you feel that you

19   are suitable for parole.

20        **INMATE CLARK:** I thought I had already done

21   that.

22        **PRESIDING COMMISSIONER PEREZ:** Would you

23   like to add anything else?

24        **INMATE CLARK:** No I think my attorney said

25   it all.

26        **PRESIDING COMMISSIONER PEREZ:** Ok, thank

27   you, we will now recess for deliberations the

80

1   time is 12:15 p.m.

2                    **R E C E S S**

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

81

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **PRESIDING COMMISSIONER PEREZ:**  Sir the panel

4    has reviewed all information received from the public

5    and relied on the following circumstances in

6    concluding that you are not suitable for parole.  And

7    that you would pose an unreasonable risk of danger to

8    society or threat to public safety if released from

9    prison. at this time.  First and foremost the main

10   reason that we are going to deny you sir is because of

11   the gravity and heinousness of this offense.  And that

12   after given the facts of this crime sir it is the

13   opinion of this panel that the offense was carried out

14   in an especially cruel, callous and heinous manner.

15   The victim was stabbed approximately 20 times and his

16   throat was slashed.  And that the record reflects that

17   there were four for five wounds that could have been

18   fatal, however the medical examiners report indicated

19   that the victims throat was cut while the victim was

20   probably still alive and this is what likely killed

21   the victim.  The offense was carried out in a

22   dispassionate and calculating manner sir and that

23   according to the record the record reflects that you

24   had intended to kill the inmate, you then preceded to

25   sharpen after leaving the bar you went home and

26   preceded to sharpen a knife and axe in preparation for

27   **JOSEPH CLARK  D-22138  DECISION PAGE 1  8/10/05**

82

1   the murder.  You then armed yourself with a knife and

2   preceded to attack the victim when he arrived, who

3   according to the record was approximately 50 pounds

4   lighter than you. / These conclusions are drawn from

5   the statement of facts where according to the record

6   sir on September 18, 1985, Clark and the victim Mr.

7   Cardoz and their companions went to a bar where they

8   were apparently drinking.  Mr. Cardoz made a comment

9   to a female bartender to which Clark took exception

10   the two apparently began to argue with Cardoz leaving

11   and going to another bar.  Later Cardoz with the two

12   other companions went to another bar where they found

13   Mr. Cardoz, the victim in this case.  Sometime later

14   as Clark and one of companions were walking home he

15   told the companion that he was going to kill Cardoz.

16   Clark stated I am tired of all this barach shit I am

17   going to put an end to him I am going to slash that

18   bastards throat.  When Clark arrived home his

19   companion observed him sharpening a knife and an axe.

20   Someone apparently hid the axe from Clark.  Cardoz

21   arrived, Clark who outweighed Cardoz by, Clark who

22   outweighed Cardoz by approximately 50 pounds jumped on

23   him stabbing him. / Clark inflicted 20 stab wounds to

24   Mr. Cardoz and slashed his throat.  During the course

25   of the stabbing Clark broke one knife then went inside

26   and obtained a second knife to continue murdering

27   **JOSEPH CLARK   D-22138   DECISION PAGE 2   8/10/05**

83

1    Cardoz. Mr. Cardoz was approximately 50 percent

2    severed from his neck. After murdering Cardoz, Clark

3    cleaned himself up changed his shirt and wrapped

4    Cardoz's body in a mattress cover. Furthermore sir

5    review of the record indicates that you have an

6    unstable social history, prior criminality which

7    includes the extensive use of alcohol. The record

8    further reflects that you are a high school dropout

9    and that you have arrests and or convictions of

10   disturbing the peace, vandalism, fighting, larceny,

11   petty theft, and possession of stolen property. The

12   record further reflects that you received a general

13   discharge from the army because of your inability to

14   refrain from abusing alcohol. Furthermore another

15   reason that we took into consideration in denying you

16   parole is the fact that according to the records in

17   1997 and 2001 the Board of Prison Terms recommended

18   that you participate in self help specifically to

19   address your alcohol dependence. And according to the

20   record during this review period you have not complied

21   with that requirement. The board would like to note

22   for the record that the most recent psychological

23   report dated February, no excuse me, dated August 15,

24   2000 is generally favorable but not totally supportive

25   of release in that this particular report authored by

26   staff psychiatrist T.R. Robertson, R-O-B-E-R-T-S-O-N,

27   **JOSEPH CLARK  D-22138  DECISION PAGE 3  8/10/05**

1    states this individual had a significant history of

2    alcoholism prior to the life crime. And at the time

3    of the crime he and the victim had been drinking

4    excessively and this contributed to the ultimate

5    crime. Currently he admits to a vague understanding

6    of this but does not feel that participation within

7    the prison setting in AA and NA or other self-help

8    groups is worth the trouble. We would like to note

9    for the record that in responses to Penal Code Section

10   3042 indicates an opposition to finding of suitability

11   by the District Attorney of Los Angeles County and the

12   Los Angeles sheriffs office. In a separate decision

13   the hearing panel notes that you have been convicted

14   of murder second and that it is not reasonable to

15   expect you will be granted parole during a hearing in

16   the next three years. As a result sir we are going to

17   deny you for three years. Again one of the main

18   reasons that we are denying you for three years in

19   that it is the opinion of the panel based on factors

20   of the commitment offense, the offense was carried out

21   in an especially cruel, callous, and heinous manner,

22   let the record reflect that the victim was stabbed

23   approximately 20 times and his throat was slashed

24   resulting in his head being approximately 50 percent

25   severed from his neck. The offense was carried out in

26   a dispassionate and calculated manner and the record

27   **JOSEPH CLARK   D-22138   DECISION PAGE 4   8/10/05**

85

1   reflects that the inmate threatened to kill the

2   victim, who then preceded to after arriving at his

3   residence sharpened a knife and axe in preparation for

4   the murder.  He armed himself with a knife and when

5   the victim arrived the record reflects the inmate

6   proceeded to attack the inmate with the knife.  It

7   should be noted for the record that the inmate

8   outweighed the victim by approximately 50 pounds.  The

9   motive for the crime was very trivial in relationship

10  to the offense.  In that it appears that it occurred

11  after the inmate had an argument with the victim at a

12  bar.  The offense was carried out in an especially, in

13  a manner which demonstrates and exceptionally callous

14  disregard for human suffering in that it is unknown

15  how long this victim suffered physically and

16  dramatically prior to his demise as a result of 20

17  stab wounds and in the result of having his throat

18  slashed.  Another reason that we took into

19  consideration in giving you the multiple year denial

20  is your unstable social history and prior criminality

21  which includes the excessive use of alcohol, the

22  record reflects that you were a high school drop out,

23  that you have been arrested either sustained either

24  arrests or convictions for disturbing the peace,

25  vandalism, fighting, arsony, petty theft, possession

26  of stolen property, furthermore the record reflects

27  **JOSEPH CLARK  D-22138  DECISION PAGE 5  8/10/05**

86

1   that while in the service you subsequently received a

2   general discharge because of your inability to refrain

3   from abusing alcohol and the problems that caused

4   while you were in the service.  Furthermore the record

5   reflects that in 1997 and as well as in 2001 the board

6   recommended that you participate in beneficial self-

7   help, the record reflects that you have not done so.

8   It is the opinion of this panel based on the facts, on

9   this hearing to date, that you need to continue, that

10  you need to take advantage of whatever self help

11  programs are available in the institution,

12  specifically to address your substance abuse relative

13  to alcohol dependence.  In terms of the last

14  psychological report the (indiscernible) is generally

15  favorable, but not totally supportive of release.

16  This particular report is authored by staff

17  psychiatrist T.R. Robertson, R-O-B-E-R-T-S-O-N, which

18  dated August 15, 2000 which states that this

19  individual has a history of alcoholism prior to the

20  life crime.  At the time of the crime eh and the

21  victim had been drinking excessively and this

22  contributed to the ultimate crime.  Currently he

23  admits to a vague understanding of this but does not

24  feel that participation within the prison setting in

25  AA and NA or other self-help groups is worth the

26  trouble.  He blandly recounted some scheduling

27  **JOSEPH CLARK  D-22138  DECISION PAGE 6  8/10/05**

87

1  difficulties and inconsistencies with AA and the

2  institution.  But made a brief reference to his

3  acknowledgement that alcohol consumption had

4  contributed significantly to most of the problems in

5  his life.  The probability that a similar event would

6  occur but in quite low but in the light of his history

7  of alcoholism and apparent failure to profit from his

8  experience it is not zero.  The panel, in terms of

9  your residence plans sir the panel would like to note

10  that you appear to have viable residential parole

11  plans, in your county of last legal residence.

12  Although you do not have a job offer, the panel would

13  like to note that you have marketable skills that you

14  would be able to utilize upon your release on parole,

15  specifically in the are of landscaping, upholstery,

16  and as a paralegal.  The hearing panel notes that

17  response to Penal Code Section 3042 in dates an

18  opposition to finding suitability by the District

19  Attorney of Los Angeles County as well as the Los

20  Angeles Sheriffs office.  The panel makes the

21  following findings sir and that is you need to

22  participate in self help, in therapy in order – For

23  two reasons, come to terms with the causative factors

24  of the commitment offense and secondly to address your

25  substance abuse, your dependence on alcohol in that it

26  is the opinion of this panel that based on the

27  **JOSEPH CLARK  D-22138  DECISION PAGE 7  8/10/05**

88

1  responses that you have given today that we do not

2  feel that you have the tools in your tool chest to be

3  able to refrain from using alcohol upon your release

4  to parole. Given that fact that you have not

5  participated in beneficial self-help while you have

6  been incarcerated and secondly the response you

7  provided to us when we asked you what you would do or

8  how would you deal with alcohol in the community. And

9  you indicated that you would just say no. Furthermore

10 it is the opinion of this panel that you attempt to

11 minimize your responsibility relative to your criminal

12 history. In that when I discussed with you your three

13 misdemeanor convictions you, it was very clear that

14 you were not taking responsibility for any of those

15 convictions and were literally blaming them on their

16 factors and not on your behavior. Nevertheless sir we

17 would like to take this opportunity to commend you for

18 having remained disciplinary free since 1989, and for

19 your average and above average work supervisory

20 reports. However these positive aspects of your

21 behavior do not outweigh the factors of suitability

22 and as a result we are going to deny you for three

23 years. In the meantime sir we make the following

24 recommendations. These recommendations have been made

25 to you in the past. We are making them to you again.

26 We are not saying that you must participate in an AA

27 **JOSEPH CLARK  D-22138  DECISION PAGE 8  8/10/05**

89

1   or NA program in that we recognize that, that is a

2   faith based program and that under the law we cannot

3   require you to participate in that program.  What we

4   are recommending is that you participate in whatever

5   self-help programs are available to you that are not

6   faith based if you do not want to participate in a

7   faith based program, that will address your alcohol

8   dependence as well as your insight into the cause and

9   factors of your commitment offense.  We recommend that

10  you continue to remain disciplinary free as you have.

11  And that you earn positive chronos if you are able to

12  do so.  Given the fact that the most recent

13  counselors, excuse me, psychiatric report is not

14  totally favorable and is quite old we are going to ask

15  the department to conduct another clinical evaluation

16  before you come before the board next time to

17  determine your potential in the free community and to

18  determine the significance of alcohol as a relates to

19  the commitment offense as well as your ability to

20  refrain from using the substances upon your release.

21  And to also determine--  We will also be asking the

22  CDC clinician to determine the extent to which you

23  have come in to terms with the underlying cause of the

24  commitment offense.  Do you have any questions sir?

25      INMATE CLARK:  No.

26      PRESIDING COMMISSIONER PEREZ:  Ok, comment?

27  JOSEPH CLARK  D-22138  DECISION PAGE 9  8/10/05

90

1      **DEPUTY COMMISSIONER COX:** Mr. Clark I will jump on

2   this table and pound my fists if I could just get it

3   through your head that we want you to address the

4   alcohol issue. I know that is a hard one for you but

5   I don't care how you do it. Through reading books,

6   giving us book reports, you know getting some officer

7   to site the fact that you and a couple of other guys

8   are working on the issue, but work on the issue.

9      **INMATE CLARK:** Ok.

10      **DEPUTY COMMISSIONER COX:** All right.

11      **PRESIDING COMMISSIONER PEREZ:** Good luck to you

12   sir. This concludes this hearing the time is 12:55

13   p.m.

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED THREE YEARS**

24   **THIS DECISION WILL BE FINAL ON:**_____        DEC = 8 2005

25   **YOU WILL BE PROMPLTY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED**

27   **JOSEPH CLARK  D-22138  DECISION PAGE 10  8/10/05**

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JENNYFER OSECHECK, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 -90, and which recording was duly recorded at R.J. DONOVAN CORRECTIONAL FACILITY, ROCK MOUNTAIN, SAN DIEGO, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF JOSEPH CLARK, CDC NO. D-22138, ON AUGUST 10, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated AUGUST 28, 2005, at Sacramento, California.

JENNYFER OSECHECK
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# RICHARD J. DONOVAN CORRECTIONAL FACILITY

## HEALTH CARE SERVICES

### PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS

#### SEPTEMBER 2000 Calendar

#### PSYCHOSOCIAL ASSESSMENT

This appears to be the 6th psychiatric evaluation conducted with this inmate for this purpose. He was last seen in January of 1997 by Dr. Saunders. In preparing this report the C-File and Medical Records were reviewed in detail. He was seen in a 60-minute interview on 8-15-01. He was aware of the purpose of the interview and that anything that he was to say might be included in the report. He was alert, well oriented, affable, and cooperative.

I.    **IDENTIFYING INFORMATION:**
      He was a forty-one-year-old unmarried Caucasian male with a birth date of 9-28-59. He had no unusual physical characteristics, nicknames or aliases. He appeared as a somewhat rounded middle aged individual in no acute distress.

II.   **DEVELOPMENTAL HISTORY:**
      He denied any knowledge of prenatal, perinatal or childhood abnormalities or defects. There was no history of abnormalities of developmental milestones, speech or language and he described himself as "the average guy" in school. There is no history of cruelty to animals, enuresis or arson. He had no significant childhood illness, operations or injuries. He denied any history of sexual abuse as perpetrator or victim.

III.  **EDUCATION:**
      He attended public schools until the eleventh grade when he quits school to "get away from my stepmother". He was vague and inexact as to precisely what he did after that collecting aluminum cans to support himself and ultimately joined the Army after a number of relatively minor conflicts with the legal system. Subsequently he states that he obtained a high school diploma at Folsom in 1988 and has a measured grade level now of 12.7. He indicated that he had taken college courses "back when they had college courses available" including the history of western civilization and speech. He was blandly disappointed that "now there are no more funds for college". He is not currently involved in any educational pursuits. He is working in the central kitchen as a maintenance man

CLARK, JOSEPH       D-22138    RJDCF/SD    F2-08-225U    TR/nbe

**BOARD OF PRISON TERMS REPORT**
**PAGE 2**

repairing refrigeration units. He stated "I'm still not sure what I'm interested in". He has had training within the prison system in upholstery, landscaping, welding, watch repair, small business machines, and probably others.

IV.   **FAMILY HISTORY:**
He is the second oldest of four children having an older full brother and a half brother and sister who are younger. His mother and father were separated and later divorced when he was six years of age. His older brother went to live with his biological mother while he went to live with his father who was eventually remarried. He notes that his father worked as a machinist at McDonald Douglas in the Torrence area and he denies that his father had any difficulty with alcohol or criminal activity. He did say that his stepmother had some type of psychological impairment in her mid life, which he states was responsible for him quitting school and essentially leaving the home after the eleventh grade. His father died in 1983 of a massive heart attack at the age of forty-six. His mother is alive and well in the Los Angeles area. His older brother works as a security guard. His half sister has completed alcoholism treatment and his younger brother is a major in the U.S. Airforce, he says, and is a pilot. He claims that his mother and siblings visit him periodically. He does not know the whereabouts of his stepmother whom he has not seen for the past fifteen years, but claims his half brother and sister visit him now and then.

V.   **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**
Puberty was age appropriate. He notes that he had his first heterosexual encounter at sixteen and claims a heterosexual orientation. He denies any high risked sexual behavior or unusual fantasies.

VI.   **MARITAL HISTORY:**
He has never been married and has no children.

VII.   **MILITARY HISTORY:**
He joined the Army in 1978 at the suggestion of his father. He completed basic training with a military occupational specialty of infantry. He completed a military tour in Korea but had some difficulty there because of alcohol abuse and dependence and was "busted there because I was drunk on duty". He later had disciplinary action for similar offenses and was treated in a six weeks inpatient program at Ford Lewis for alcoholism. He says that he ultimately completed his three-year tour in the military, had achieved the rank of E-1 at that time, and received a general discharge but under honorable conditions.

CLARK, JOSEPH     D-22138   RJDCF/SD   F2-08-225U   TR/nbe

2

**BOARD OF PRISON TERMS REPORT**
**PAGE 3**

**VIII.  EMPLOYMENT AND INCOME HISTORY:**

Subsequent to discharge from the Army, he worked sporadically as a security guard.  He denies having had the alcohol problems at work and states that he was able to refrain from drinking during his times of employment.  He volunteered little spontaneous information and answers to most questions were uniformly brief.  As noted earlier, he has no specific interest now but works as a repairman on refrigeration equipment in the central kitchen has a pay number and gets along fairly well in his current job.  He was fired from PIA Bakery in 1994 for insubordination and in 1996 was caught stealing soap from the kitchen.

**IX.  SUBSTANCE ABUSE HISTORY:**

He states that he experimented with marijuana at the age of fourteen and began drinking at the age of fifteen.  He had difficulty with military authority because of his drinking, drinking on duty and had several disciplinary actions in the Army.  He participated in an inpatient alcoholism treatment program while in the Army at Fort Lewis, Washington.  In his C-File there is a note that he had some difficulty on one occasion for manufacturing alcohol within the prison setting.

**X.  PSYCHIATRIC AND MEDICAL HISTORY:**

He denies ever having had previous psychiatric treatment.  The diagnoses on all of his previous reports include Alcohol Abuse or Dependence in institutional remission, coupled with an Axis II diagnosis of Antisocial Personality Traits.  His only inpatient treatment experience was in the military in 1981 and consisted of an alcohol rehabilitation program lasting six weeks.  He denies serious accident, head injury, seizures or neurological conditions.  There is no history of suicidiality and only the one episode of homicidal and assaultive behavior.  He takes no medications and is not in the mental health treatment program.

**XI.  PLANS IF GRANTED RELEASE:**

He has only vague ideas relative to what he would do were he to be released.  He noted "I talked to a friend who had a plumbing business once but he never wrote back".  He says that he has a trust fund of about $60k from his father's state, which he will receive if he gets out of prison or turns forty-five, whichever occurs first.  He stated that if he were to be released, he would stay with his mother "until I get settled" and would try to find some type of employment.  He is not now currently involved in any

**CLARK, JOSEPH     D-22138     RJDCF/SD     F2-08-225U     TR/nbe**

3

**BOARD OF PRISON TERMS REPORT**
**PAGE 4**

active participation with AA or NA but he has done so in the past.
Problems with his plan include a lack of a definitive interest, his history of
alcoholism and the fact that he does have a potential source of income
from his trust. This trust seems insufficient in value to provide any long
term support.

## CLINICAL ASSESSMENT

XII.    **CURRENT MENTAL STATUS/TREATMENT NEEDS:**
He was an alert, oriented, affable relatively cheerful man in no acute
distress. Speech was methodical but generally logical and goal directed if
vague in an exact in dealing with details of his life experience and
feelings. Associations were intact. There was no suicidal or homicidal
ideation and no evidence of hallucinations or delusions. Fund of
knowledge was fair. He was able to subtract and abstract. Social
judgment appeared to be intact within the institutional setting.

**CLINICAL DIAGNOSIS:**
Axis I: Alcohol dependence in institutional remission.
Axis II:        Antisocial personality traits ameliorated with the time but
                sporadically evident during his incarceration since 1986.
Axis III:       He has no acute physical condition. Review of his medical
                record indicates that there are relatively few entries therein.
Axis IV:        Incarceration.
Axis V:         GAF = 70.

XIII.    **REVIEW OF LIFE CRIME:**
This inmate notes "we got into a fight". He stated that the victim had been
a friend of his for "a number of years" and "we were both drunk". He
claimed that the victim was upset about having lost money to a female
bartender in the bar where they had been drinking. He notes "he got
upset with me, so I left, he was mad and then he left and went to another
bar, we went there walked up and he was still upset". He then states that
he left with a friend and returned to his house. The victim arrived there
later and was said to be aggressive and threatening. He says that they
went outside and "we just got into it". He says the victim was still angry,
claims that he took a knife from the victim in the struggle and that both he
and the victim were drunk. He did not elaborate details of the crime, the

CLARK, JOSEPH       D-22138   RJDCF/SD   F2-08-225U   TR/nbe

*4*

**BOARD OF PRISON TERMS REPORT**
**PAGE 5**

intensity and grotesqueness of which are described in various places within the C-File. The inmate notes matter of factly that he was depressed for months after this event and states that he continues to have only partial memories for the entire crime. He stated "It was a screwed up episode for me and him, if I would have done anything different, I wouldn't have let him bet Barbara at the pool table and lose all his money"... indicating that the victim's rage at this had something to do with the ultimate confrontation and homicide. Again, his description of the events was vague and somewhat desultory with little detail and only answers to specific questions. It is probable that alcohol consumption on his and the victim's part was a very significant contributing factor. Without this factor it is doubtful that he crime would have taken place.

XIV.    **ASSESSMENT OF DANGEROUSNESS:**
Within a controlled setting, this inmate is probably less dangerous than the average inmate. If released into the community, this would probably be maintained but the significant risk factors related to alcohol use would remain and pose a significant and unpredictable variable.

XV:     **CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**
This individual had a significant history of alcoholism prior to the life crime. At the time of the crime he and the victim had both been drinking excessively and this contributed to the ultimate crime. Currently he admits to a vague understanding of this but does not feel that participation within the prison setting in AA, NA or other self-help groups is "worth the trouble". He blandly recounted some scheduling difficulties and inconsistencies with AA within the institution, but made a brief reference to his acknowledgment that alcohol consumption had contributed significantly to most of the problems in his life. The probability that a similar event would occur is quite low but in the light of his history of alcoholism and apparent failure to profit from experience, it is not zero.


**T. R. ROBERTSON, M.D.**
**Staff Psychiatrist**




CLARK, JOSEPH     D-22138    RJDCF/SD    F2-08-225U    TR/nbe
D: 08/15/00
T: 08/16/00

*5*

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | DECEMBER 27, 2006 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 003805
In re,
JOSEPH CLARK,
      Petitioner,
    On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on January 4, 2006, as well as the return and denial filed in response to the court's order to show cause. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole. (See Cal. Code Regs., tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received into custody on January 22, 1986 for a conviction of second degree murder. He is currently serving a sentence of 15 years to life with a minimum eligible parole date of December 27, 1995. The record reflects that on September 8, 1985, petitioner went to a bar where he had a confrontation with the victim about a comment that the victim made to a female bartender. The victim left the bar after the confrontation for another bar. At the end of the night, petitioner told his companions that he was going to kill the victim. When the victim arrived at petitioner's house, petitioner jumped on him and stabbed him multiple times. Petitioner used such force that his knife broke while stabbing the victim. Petitioner went into his house to retrieve another knife to continue stabbing the victim, slashing the victim's throat such that his head was almost severed from his body.

On August 10, 2005, the Board denied petitioner parole for three years. The Board concluded that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison. The Board based its decision on several factors, including his commitment offense. There is some evidence that petitioner is unsuitable based on the finding that the offense was committed in a dispassionate and calculated manner. (See Cal. Code Regs., tit. 15, § 2402(c)(1)(B).)

The record further reflects that the Board also relied on several additional factors in denying petitioner parole at this time, and there is some evidence to support that decision. The Court finds that there is some evidence to support its finding of unsuitability because petitioner has not sufficiently participated in beneficial self-help that would indicate an enhanced ability to function within the law upon release. (See Cal. Code Regs., tit. 15, § 2402, subd. (d)(9).) The Board found that petitioner's psychological evaluation was not supportive of release.

However, the Court rejects the Board's finding that petitioner is unsuitable based on its finding that petitioner has an unstable social history and has a prior criminal record. The Board cited to petitioner not completing high

1

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | DECEMBER 27, 2006 | | | |
|-------|-------------------|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

| | |
|---|---|
| BH 003805<br>In re,<br>JOSEPH CLARK,<br>　　　　Petitioner,<br>　　On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: |

school and a discharge from the Army due to alcohol abuse to support its finding of an unstable social history. However, the Board has no evidence that petitioner has a history of unstable or tumultuous relationships with others as required for finding this factor in the regulations. (See Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(3).) In addition, the Court finds that the Board has no evidence of a juvenile record nor a prior criminal record that was violent. (See Cal. Code Regs., tit. 15, § 2402, subds. (c)(1)(2) & (d)(1).)

The Board was acting within its authority when it considered petitioner's positive preconviction and postconviction factors in concluding that he would pose an unreasonable threat to public safety. (See Pen. Code § 3041, subd. (b).)

Therefore, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Linda Buchalter, Esq.
Law Office of Linda Buchalter
1011 5th Street, #6
Santa Monica, CA 90403
Attorney for Petitioner Joseph Clark

Department of Justice – State of California
Office of the Attorney General
J. Conrad Schroeder, Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013

2

| Minutes Entered |
|---|
| 12-27-06 |
| County Clerk |

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

COURT OF APPEAL · SECOND DIST.

F I L E D

AUG 8 2007

JOSEPH A. LANE                    Clerk

_____ Deputy Clerk

In re

JOSEPH CLARK,

on Habeas Corpus.

)
)
)
)
)
)
)
)
)
)

B196553

(Super.Ct.Nos. A912667
and BH003805)
(Steven R. Van Sicklen, Judge)

ORDER

THE COURT:*

The petition for writ of habeas corpus has been read and considered.

The petition is denied. (*In re Dannenberg* (2005) 34 Cal.4th 1068, 1071, 1094-1095; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 685-686.)

_____     _____     _____
* WILLHITE, Acting P. J.,      MANELLA, J.,      SUZUKAWA, J.

28

l·d

Court of Appeal, Second Appellate District, Div. 4 - No. B196553
**S155530**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JOSEPH CLARK on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

OCT 2 4 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

1

2

3                    **SUPERIOR COURT OF CALIFORNIA**

4                      **COUNTY OF SANTA CLARA**

5

(ENDORSED)
**FILED**

AUG 3 0 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BRET MORROW, DEPUTY

6

7    In re                              )    No.: 71614
                                        )
8        ARTHUR CRISCIONE,              )
                                        )    ORDER
9    On Habeas Corpus                   )
                                        )

10

11

12                         **INTRODUCTION**

13        Petitioner alleges that he has been denied due process of law

14    because the Board has used standards and criteria which are

15    unconstitutionally vague in order to find him unsuitable for parole.

16    Alternatively, he argues that those standards, even if

17    constitutionally sound, are nonetheless being applied in an arbitrary

18    and meaningless fashion by the Board.  He relies upon evidence that

19    in one hundred percent of 2690 randomly chosen cases, the Board found

20    the commitment offense to be "especially heinous, atrocious or

21    cruel", a factor tending to show unsuitability under Title 15

22    §2402(c)(1).

23        **Are the Board Criteria Unconstitutionally Vague?**

24        Our courts have long recognized that both state and federal due

25    process requirements dictate that the Board must apply detailed

26    standards when evaluating whether an individual inmate is unsuitable

27    for parole on public safety grounds.  (See *In re Dannenberg* (2005) 34

28

1

Cal.4th 1061 at p. 1096, footnote 16.)  Those standards are found in

15 CCR §2402(c) (Dannenberg, supra, 34 Cal.4th at p. 1080,) and do

include detailed criteria to be applied by the Board when considering

the commitment offense:

> (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

In response to Petitioners claim that the regulations are impermissibly vague, Respondent argues that while "especially heinous, atrocious or cruel" might be vague in the abstract it is limited by factors (A)-(E) of §2402(c)(1), and thus provides a 'principled basis' for distinguishing between those cases which are contemplated in that section and those which are not.  An examination of cases involving vagueness challenges to death penalty statutes is instructive here and shows that Respondent's position has merit:

> "Our precedents make clear that a State's capital sentencing

scheme also must genuinely narrow the class of persons eligible for the death penalty. When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard v. Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating circumstance that 'an ordinary person could honestly believe' described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S. 420, 428-429: "A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'")

It cannot fairly be said that 'every murder' could be categorized as "especially heinous, atrocious or cruel" under the Board regulations, since the defining factors contained in subdivisions (A)-(E) clearly narrow the group of cases to which it applies. Although Petitioner also argues that the "vague statutory language is not rendered more precise by defining it in terms or synonyms of equal or greater uncertainty" (*People v. Superior Court (Engert)* (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 249. *See also Walton v. Arizona* (1990) 497 U.S. 639, 654), the factors in those subdivisions are not themselves vague or uncertain. The mere fact that there may be some subjective component (such as "exceptionally callous" disregard for human suffering) does not render that factor unconstitutionally vague. The proper degree of definition of such factors is not susceptible of mathematical precision, but will be constitutionally sufficient if it gives meaningful guidance to the Board.

A law is void for vagueness if it "fails to provide adequate notice to those who must observe its strictures and impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and

discriminatory application."  *(People v. Rubalcava* (2000) 23 Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997) 14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108-109.)

A review of cases expressing approval of definitions to limit the application of otherwise vague terms in death penalty statutes leads inextricably to the conclusion that the limiting factors in §2402(c) easily pass constitutional muster.  An Arizona statute was upheld that provided a crime is committed in an 'especially cruel manner' when the perpetrator inflicts mental anguish or physical abuse before the victim's death," and that "mental anguish includes a victim's uncertainty as to his ultimate fate."  *(Walton v. Arizona* (1990) 497 U.S. 639, 654.)  Similarly, the court in *Maynard v. Cartwright*, 486 U.S. at 364-365, approved a definition that would limit Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance to murders involving "some kind of torture or physical abuse.  In Florida, the statute authorizing the death penalty if the crime is "especially heinous, atrocious, or cruel," satisfied due process concerns where it was further defined as "the conscienceless or pitiless crime which is unnecessarily torturous to the victim."  *State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

Here, the factors in subdivisions (A)-(E) provide equally clear limiting construction to the term "especially heinous, atrocious, or cruel" in §2402(c).

## Has the Board Engaged in a Pattern of Arbitrary Application of the Criteria?

As previously noted, 15 CCR §2402 provides detailed criteria for determining whether a crime is "exceptionally heinous, atrocious or cruel" such that it tends to indicate unsuitability for parole.  Our

1    courts have held that to fit within those criteria and thus serve as

2    a basis for a finding of unsuitability, the circumstances of the

3    crime must be more aggravated or violent than the minimum necessary

4    to sustain a conviction for that offense.  (*In re Rosenkrantz* (2002)

5    29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the

6    prisoner's offense, *alone,* can constitute a sufficient basis for

7    denying parole.  (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.)

8         Petitioner claims that those criteria, even if constitutionally

9    sound, have been applied by the Board in an arbitrary and capricious

10   manner rendering them devoid of any meaning whatever.  The role of

11   the reviewing court under these circumstances has been addressed

12   previously in the specific context of Parole Board actions:

13        "[Courts have] an obligation, however, to look beyond the facial
          validity of a statute that is subject to possible
14        unconstitutional administration since a law though fair on its
          face and impartial in appearance may be open to serious abuses
15        in administration and courts may be imposed upon if the
          substantial rights of the persons charged are not adequately
16        safeguarded at every stage of the proceedings.  We have
          recognized that this court's obligation to oversee the execution
17        of the penal laws of California extends not only to judicial
          proceedings, but also to the administration of the Indeterminate
18        Sentence Law."  (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
          quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)

19

20        Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21   closest on point to the present situation, the California Supreme

22   Court stated: "This court has traditionally accepted its

23   responsibility to prevent an authority vested with discretion from

24   implementing a policy which would defeat the legislative motive for

25   enacting a system of laws."  Where, as here, the question is whether

26   determinations are being made in a manner that is arbitrary and

27   capricious, judicial oversight "must be extensive enough to protect

28

1  limited right of parole applicants 'to be free from an arbitrary

2  parole decision... and to something more than mere pro-forma

3  consideration.'"  (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564,

4  quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge.

## The Evidence Presented

9      A similar claim to those raised here, involving allegations of

10 abuse of discretion by the Board in making parole decisions, was

11 presented to the Court of Appeal in *In re Ramirez, supra*.  The court

12 there observed that such a "serious claim of abuse of discretion"

13 must be "adequately supported with evidence" which should be

14 "comprehensive."  (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5.)

15 The claim was rejected in that case because there was not "a

16 sufficient record to evaluate."  (*Ibid.*)  In these cases, however,

17 there is comprehensive evidence offered in support of Petitioner's

18 claims.

19     Discovery orders were issued in five different cases involving

20 life term inmates (Petitioners) who all presented identical claims.[1]

---

22 [1] This Court takes judicial notice of the several other cases currently
pending (Lewis #68038, Jameson #71194, Bragg #108543, Ngo #127611.) which
23 raise this same issue and in which proof was presented on this same point.
(Evidence Code § 452(d).  See specifically, in the habeas corpus context,
24 *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
notice was taken of the evidence in four other cases and in which the court
25 noted: "Facts from other cases may assist petitioner in establishing a
pattern."  See generally *McKell v. Washington Mutual, Inc.* (2006) 142
26 Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
judicial notice of ... established facts from both the same case and other
cases."  And see *AB Group v. Wertin* (1997) 59 Cal.App.4th 1022, 1036:
27 Judicial notice taken of other cases when matters are "just as relevant to
the present [case] as they are to the others.")

1  The purpose of the discovery was to bring before the Court a
2  comprehensive compilation and examination of Board decisions in a
3  statistically significant number of cases.  The Board decisions under
4  examination consisted of final decisions of the Board for life-term
5  inmates convicted of first or second degree murder and presently
6  eligible for parole.  Included were all such decisions issued in
7  certain months, chosen by virtue of their proximity in time to the
8  parole denials challenged in the pending petitions.  All Board
9  decisions in the months of August, September and October of 2002,
10 July, August, September, October, November, and December of 2003,
11 January and February of 2004, February of 2005, and January of 2006
12 were compiled.  This resulted in a review of 2690 cases decided in a
13 total of 13 months.
14        The purpose of the review was to determine how many inmates had
15 actually been denied parole based in whole or in part on the Board's
16 finding that their commitment offense fits the criteria set forth in
17 Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18 member of the research team conducting the review, Karen Rega,
19 testified that in its decisions the Board does not actually cite CCR
20 rule §2402(c), but consistently uses the specific words or phrases
21 ("verbiage from code") contained therein, so that it could easily be
22 determined when that criteria was being applied.  (For example,
23 finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24 "dispassionate" "calculated" or "execution style" invokes
25 §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26 invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27 demonstrated a "disregard for human suffering" fits criteria
28

7

1  §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2  or "trivial" invokes §2402(c)(1)(E).)

3      Petitioners provided charts, summaries, declarations, and the

4  raw data establishing the above in the cases of Lewis #68038,

5  Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6  (Criscione #71614) the evidence was presented somewhat differently.

7  Both to spread the burden of the exhaustive examination, and to

8  provide a check on Petitioners' methods, this Court ordered

9  Respondent to undertake an examination of two randomly chosen months

10 in the same manner as Petitioner had been doing.  Respondent complied

11 and provided periodic updates in which they continued to report that

12 at all "the relevant hearings the Board relied on the commitment

13 offense as a basis for denying parole."  (See "Respondent's Final

14 Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15 on this matter counsel for Respondents stipulated that "in all of

16 those cases examined [by Respondent pursuant to the Criscione

17 discovery orders] the Board relied on the commitment offense as a

18 basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19 evidentiary hearing transcript.)

20     The result of the initial examination was that in over 90

21 percent of cases the Board had found the commitment offense to be

22 "especially heinous, atrocious or cruel" as set forth in Title 15

23 §2402(c)(1).  In the remaining 10% of cases either parole had been

24 granted, or it was unclear whether §2402(c)(1) was a reason for the

25 parole denial.  For all such cases, the decisions in the prior

26 hearing for the inmate were obtained and examined.  In every case,

27 the Board had determined at some point in time that every inmates

28

8

1 | crime was "especially heinous, atrocious or cruel" under Title 15

2 | §2402(c)(1).

3 |     Thus, it was shown that 100% of commitment offenses reviewed by

4 | the Board during the 13 months under examination were found to be

5 | "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6 |     A further statistic of significance in this case is that there

7 | are only 9,750 inmates total who are eligible for, and who are

8 | currently receiving, parole consideration hearings as life term

9 | inmates.  (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10 | filed April 16, 2007.)

11 |

12 | **USE OF STATISTICS**

13 |     In *International Brotherhood of Teamsters v. United States*

14 | (1977) 431 U.S. 324, 338-340, the United States Supreme Court

15 | reaffirmed that statistical evidence, of sufficient "proportions,"

16 | can be sound and compelling proof.  As noted by the court in *Everett*

17 | *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18 | therein, "courts regularly have employed statistics to support an

19 | inference of intentional discrimination."

20 |     More recently, the United States Supreme Court, in *Miller-El v.*

21 | *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22 | petitioner's allegations that the prosecutor was illegally using his

23 | peremptory challenges to exclude African-Americans from the

24 | petitioner's jury, noted that "the statistical evidence alone" was

25 | compelling.  The high court analyzed the numbers and concluded:

26 | "Happenstance is unlikely to produce this disparity."  (See also

27 | *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28 |

1   evidence" was noted as possibly being dispositive.  And see *People v.*
2   *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3   analysis, combined into an "actuarial instrument" was substantial
4   proof.)

5       A statistical compilation and examination such as has been
6   presented in these cases is entirely appropriate and sufficient
7   evidence from which to draw sound conclusions about the Board's
8   overall methods and practices.

9

10                        **THE EXPERT'S TESTIMONY**

11      Petitioners provided expert testimony from Professor Mohammad
12   Kafai regarding the statistics and the conclusions that necessarily
13   follow from them.  Professor Kafai is the director of the statistics
14   program at San Francisco State University, he personally teaches
15   statistics and probabilities, and it was undisputed that he was
16   qualified to give the expert testimony that he did.  No evidence was
17   presented that conflicts or contradicts the testimony and conclusions
18   of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19   testimony was to be admissible and considered in the cases of all
20   five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21   hearing transcript.)

22      Professor Kafai testified that the samples in each case, which
23   consisted of two or three months of Board decisions, are
24   statistically sufficient to draw conclusions about the entire
25   population of life term inmates currently facing parole eligibility
26   hearings.  Given that every inmate within the statistically
27   significant samples had his or her crime labeled "'particularly

28

1  egregious'" or "especially heinous, atrocious or cruel" under Title

2  15 §2402(c)(1), it can be mathematically concluded that the same

3  finding has been made for every inmate in the entire population of

4  9,750. Although he testified that statisticians never like to state

5  unequivocally that something is proven to a 100% certainty, (because

6  unforeseen anomalies are always theoretically possible,) he did

7  indicate the evidence he had thus far examined came as close to that

8  conclusion as could be allowed. Not surprisingly, Professor Kafai

9  also testified that "more than 50% can't by definition constitute an

10 exception."

11      Having found the data provided to the expert to be sound this

12 Court also finds the expert's conclusions to be sound. In each of

13 the five cases before the Court over 400 inmates were randomly chosen

14 for examination. That number was statistically significant and was

15 enough for the expert to draw conclusions about the entire population

16 of 9,750 parole eligible inmates. The fact that the approximately

17 2000 inmates examined in the other cases also had their parole denied

18 based entirely or in part on the crime itself (§2402(c)(1)), both

19 corroborates and validates the expert's conclusion in each individual

20 case and also provides an overwhelming and irrefutable sample size

21 from which even a non expert can confidently draw conclusions.

22

23                              **DISCUSSION**

24      Although the evidence establishes that the Board frequently says

25 parole is denied "first," "foremost," "primarily," or "mainly,"

26 because of the commitment offense, this statement of primacy or

27 weight is not relevant to the question now before the Court.

28

1  Petitioners acknowledge that the Board generally also cites other

2  reasons for its decision.   The question before this Court, however,

3  is not whether the commitment offense is the primary or sole reason

4  why parole is denied -- the question is whether the commitment

5  offense is labeled "'particularly egregious'" and thus could be used,

6  under *Dannenberg,* primarily or exclusively to deny parole.

7      The evidence proves that in a relevant and statistically

8  significant period where the Board has considered life term offenses

9  in the context of a parole suitability determination, every such

10  offense has been found to be "particularly egregious" or "especially

11  heinous, atrocious or cruel."[2]   This evidence conclusively

12  demonstrates that the Board completely disregards the detailed

13  standards and criteria of §2402(c).   "Especially" means particularly,

14  or "to a distinctly greater extent or degree than is common."[3]   (EC §

15  451(e).)   By simple definition the term "especially" as contained in

16  section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17  is precisely how it has been applied by the Board.  As pointed out by

18  the Second District Court of Appeal, not every murder can be found to

19  be "atrocious, heinous, or callous" or the equivalent without "doing

20  ─────────────────────

[2] In a single case out of the 2690 that were examined Petitioner has conceded that
21  the Board did not invoke §2402(c)(1).  This Court finds that concession to be
improvidently made and the result of over caution.  When announcing the decision at
the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
22  by stating "I don't believe this offense is particularly aggravated..."  However
the commissioner proceeds to describe the crime as a drug deal to which Fletcher
23  brought a gun so "we could say there was some measure of calculation in that."  The
commissioner continued by observing that the reason someone would bring a gun to a
drug transaction was to make sure things went according to their plan "so I guess
24  we can say that that represents calculation and perhaps it's aggravated to that
extent."  As is the Board's standard practice, by using the word 'calculated' from
25  §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
had brought a habeas petition Respondent's position would be that there is 'some
26  evidence' supporting this.  The ambiguity created by the commissioner's initial
statement was cleared up several pages later when he announces that "based upon the
crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2006)
27  136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
year denial.)

28

12

violence" to the requirements of due process. (*In re Lawrence* (2007)
150 Cal.App.4th 1511, 1557.) This is precisely what has occurred
here, where the evidence shows that the determinations of the Board
in this regard are made not on the basis of detailed guidelines and
individualized consideration, but rather through the use of all
encompassing catch phrases gleaned from the regulations.

### THE BOARD'S METHODS

Because it makes no effort to distinguish the applicability of
the criteria between one case and another, the Board is able to force
every case of murder into one or more of the categories contained in
§2402(c).

For example, if the inmate's actions result in an instant death
the Board finds that it was done in a "dispassionate and calculated
manner, such as an execution-style murder." At the same time the
Board finds that a murder not resulting in near instant death shows a
"callous disregard for human suffering" without any further analysis
or articulation of facts which justify that conclusion. If a knife
or blunt object was used, the victim was "abused, defiled, or
mutilated." If a gun was used the murder was performed in a
"dispassionate and calculated manner, such as an execution-style
murder." If bare hands were used to extinguish another human life
then the crime is "particularly heinous and atrocious."

Similarly, if several acts, spanning some amount of time, were
necessary for the murder the Board may deny parole because the inmate
had "opportunities to stop" but did not. However if the murder was

---

[3] Princeton University World Net Dictionary (2006).

13

1  accomplished quickly parole will be denied because it was done in a

2  dispassionate and calculated manner and the victim never had a chance

3  to defend themselves or flee.  If the crime occurred in public, or

4  with other people in the vicinity, it has been said that the inmate

5  "showed a callous disregard" or "lack of respect" for the

6  "community."  However if the crime occurs when the victim is found

7  alone it could be said that the inmate's actions were aggravated

8  because the victim was isolated and more vulnerable.

9       In this manner, under the Board's cursory approach, every murder

10 has been found to fit within the unsuitability criteria.  What this

11 reduces to is nothing less than a denial of parole for the very

12 reason the inmates are present before the Board - i.e. they committed

13 murder.  It is circular reasoning, or in fact no reasoning at all,

14 for the Board to begin each hearing by stating the inmate is before

15 them for parole consideration, having passed the minimum eligible

16 parole date based on a murder conviction, and for the Board to then

17 conclude that parole will be denied because the inmate committed acts

18 that amount to nothing more than the minimum necessary to convict

19 them of that crime.  As stated quite plainly by the Sixth District:

20 "A conviction for murder does not automatically render one unsuitable

21 for parole."  (*Smith, supra*, 114 Cal.App.4th at p. 366, citing

22 *Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

23      In summary, when every single inmate is denied parole because

24 his or her crime qualifies as a §2402(c)(1) exception to the rule

25 that a parole date shall normally be set, then the exception has

26 clearly swallowed the rule and the rule is being illegally

27 interpreted and applied.  When every single life crime that the Board

28

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts.  Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10  *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11  *re Capistran.*

12      When "the record provides no reasonable grounds to reject, or

13  even challenge, the findings and conclusions of the psychologist and

14  counselor concerning [the inmate's] dangerousness" the Board may not

15  do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16      When an inmate, although only convicted of a second degree

17  murder, has been incarcerated for such time that, with custody

18  credits, he would have reached his MEPD if he had been convicted of a

19  first, the Board must point to evidence that his crime was aggravated

20  or exceptional even for a first degree murder if they are going to

21  use the crime as a basis for denying parole.  (*In re Weider* (2006)

22  145 Cal.App.4th 570, 582-583.)[4]

23

24  [4]    This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
    particularly applicable in this case.  Petitioner was convicted of second degree,
    but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*

25  (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even
    had he been convicted of a first.  In a currently pending habeas petition in which

26  he challenges his 2007 parole denial the first reason the Board gave was the crime
    itself and the presiding commissioner explained: "His actions go well beyond the
    minimum necessary for a conviction of murder in the second degree."  (Decision page

27  2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
    that he was acquitted of first degree is further proof of their willfulness and

28

1    A "petitioner's young age at the time of the offense" must be

2    considered. (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting

3    *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4    1085: "The reliability of the facts of the crime as a predictor for

5    his dangerousness was diminished further by his young age of 18, just

6    barely an adult. 'The susceptibility of juveniles to immature and

7    irresponsible behavior means their irresponsible conduct is not as

8    morally reprehensible as that of an adult.'")[5]

9        The Board's formulaic practice of stating §2402(c)(1) phrased in

10   a conclusory fashion, and then stating "this is derived from the

11   facts" without ever linking the two together, is insufficient. (*In

12   re Roderick*, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the

13   Board is responsible for articulating the grounds for its findings

14   and for citing to evidence supporting those grounds." (See also *In

15   re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving

16   "conclusorily" announced findings.)

17        After two decades, mundane "crimes have little, if any,

18   predictive value for future criminality. Simply from the passing of

19   time, [an inmate's] crimes almost 20 years ago have lost much of

20   their usefulness in foreseeing the likelihood of future offenses than

21   if he had committed them five or ten years ago." (*In re Lee* (2006)

22   143 Cal.App.4th 1400, 1412.) It should be noted that this rule

23

24   bias. The jury had a reasonable doubt that Petitioner committed first degree
     murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
     position than if they had not. Had the jury convicted him of the greater offense
     Petitioner has served so much time that he would already be having subsequent

25   parole hearings on a first and the Board would not have been able to use the 'some
     evidence' of first degree behavior against him. As observed previously, the

26   Board's position in this regard is "so ridiculous that simply to state it is to
     refute it." (*Weider, supra*, 145 Cal.App.4th at p. 583.)

27   [5] This point is particularly significant in the case of Mike Ngo. Mr. Ngo was only
     18 at the time of his crime. The impetus behind the shooting was youth group or

28

16

1  applies with even more force when the Board is relying on any

2  criminality that occurred before the crime.  In that situation, just

3  as with the crime itself, the Board must explain why such old events

4  have any relevance and especially when the inmate has spent a decade

5  as a model prisoner.

6      Murders situationally related to intimate relationships are

7  unfortunately commonplace because emotions are strongest in such

8  domestic settings.  When a murder occurs because of "stress unlikely

9  to be reproduced in the future" this is a factor that affirmatively

10 points towards suitability.  (*In re Lawrence* (2007) 150 Cal.App.4th

11 1511 and cases cited therein.)

12     "The evidence must substantiate the ultimate conclusion that the

13 prisoner's release currently poses an unreasonable risk of danger to

14 the public.  It violates a prisoner's right to due process when the

15 Board or Governor attaches significance to evidence that forewarns no

16 danger to the public."  (*In re Tripp* (2007) 150 Cal.App.4th 306,

17 313.)

18     The Board "cannot rely on the fact that the killing could have

19 been avoided to show the killing was especially brutal."  (*In re

20 Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

21     The Board's focus must be upon how the inmate "actually

22 committed his crimes" not the "incorporeal realm of legal

23 constructs."  (*Lee, supra*, 143 Cal.App.4th at p. 1413.)  This is

24 especially significant when the murder conviction is based on the

25 felony murder rule, provocative act doctrine, or accomplice liability

26 such that the inmate did not intend to kill or may not have even been

27

28

gang rivalries, posturing, and threats which mature adults would not have been

1   the actual killer.

2       The Board has ample guidance before it in the decisions of the

3   various reviewing courts to constrain its abuse, but has failed to

4   avail itself of the opportunity to do so.

5

6                   **SEPARATION OF POWERS DOCTRINE**

7       The evidence presented, as discussed above, has established a

8   void for vagueness "as applied" due process violation.  That same

9   evidence also proves a separate but related Constitutional violation

10  -- an as applied separation of powers violation.

11      The separation of powers doctrine provides "that the legislative

12  power is the power to enact statutes, the executive power is the

13  power to execute or enforce statutes, and the judicial power is the

14  power to interpret statutes and to determine their

15  constitutionality."  (*Lockyer v. City and County of San Francisco*

16  (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17  Board is not executing/enforcing the legislature's statutes as

18  intended it is this Court's duty to intervene.  The question here is

19  whether the Board is violating the separation of powers doctrine by

20  appropriating to itself absolute power over parole matters and

21  disregarding the limits and guidelines placed by the statute.[6]

22      "Government Code section 11342.2 provides: 'Whenever by the

23

_____

caught up in.

24  [6] "It is settled that Administrative regulations that violate acts of the
    Legislature are void and no protestations that they are merely an exercise of

25  administrative discretion can sanctify them.  They must conform to the legislative
    will if we are to preserve an orderly system of government.  Nor is the motivation

26  of the agency relevant: It is fundamental that an administrative agency may not
    usurp the legislative function, no matter how altruistic its motives are."

27  (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
    Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
    San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28

1   express or implied terms of any statute a state agency has authority

2   to adopt regulations to implement, interpret, make specific or

3   otherwise carry out the provisions of the statute, no regulation

4   adopted is valid or effective unless consistent and not in conflict

5   with the statute and reasonably necessary to effectuate the purpose

6   of the statute.'  Administrative regulations that alter or amend the

7   statute or enlarge or impair its scope are void and courts not only

8   may, but it is their obligation to strike down such regulations."

9   (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75

10  Cal.App.4th 1315, 1341, citations omitted.)

11       The vice of overbroad and vague regulations such as are at issue

12  here is that they can be manipulated, or 'interpreted,' by executive

13  agencies as a source of unfettered discretion to apply the law

14  without regard to the intend of the people as expressed by the

15  legislature's enabling statutes.  In short, agencies usurp unlimited

16  authority from vague regulations and become super-legislatures that

17  are unaccountable to the people.  As it has sometimes been framed and

18  addressed in the case law, a vague or all encompassing standard runs

19  the risk of "violat[ing] the separation of powers doctrine by

20  'transforming every [executive decisionmaker] into a "mini-

21  legislature" with the power to determine on an ad hoc basis what

22  types of behavior [satisfy their jurisdiction].'"  (*People v. Ellison*

23  (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*

24  *(Caswell)* (1988) 46 Cal.3d 381, 402.)

25       "It is concern about 'encroachment and aggrandizement,' the

26  [United States Supreme Court] reiterated, that has animated its

27  separation of powers jurisprudence.  'Accordingly, we have not

28

1  hesitated to strike down provisions of law that either accrete to a

2  single Branch powers more appropriately diffused among separate

3  Branches or that undermine the authority and independence of one or

4  another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th

5  472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,

6  382.)  This articulation of the principle speaks directly to the

7  situation at hand.  The Board, by its enactment and interpretation of

8  Title 15, §2402, has appropriated to itself absolute power over

9  'lifer' matters.  Overreaching beyond the letter and spirit of the

10 Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by

11 the Board to supply the power to declare every crime enough to deny

12 parole forever.  The fact that Title 15, §2402, has been invoked in

13 every case, but then sometime later not invoked, tends to show either

14 completely arbitrary and capricious behavior or that unwritten

15 standards are what really determine outcomes.  In either event, all

16 pretenses of taking guidance from, or being limited by, the

17 legislature's statutes have been abandoned.  "[I]t is an elementary

18 proposition that statutes control administrative interpretations."

19 (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)

20 Title 15 §2402 as applied, however, has no controls or limitations.

21      The PC § 3041(b) exception to the rule can only be invoked when

22 the "gravity of the current convicted offense or offenses, or the

23 timing and gravity of current or past convicted offense or offenses,

24 is such that consideration of the public safety requires a more

25 lengthy period of incarceration for this individual."  The word

26 "gravity" is a directive for comparison just as "more lengthy"

27 indicates a deviation from the norm.  While *Dannenberg* held there

28

1   does not need to be intra case comparison for the purposes of term

2   uniformity or proportionality, there necessarily has to be some sort

3   of comparison for the purposes of adhering to the legislative mandate

4   that parole is available.  The Board employs no meaningful yardstick

5   in measuring parole suitability.  This is a violation of the

6   separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d

7   705, 712-713.  And see *Terhune v. Superior Court* (1998) 65

8   Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*

9   (2001) 531 U.S. 457, 472, describing a delegation challenge as

10  existing when the legislature fails to lay down "an intelligible

11  principle to which the person or body authorized to act is directed

12  to conform.")

13

14                            **RESPONDENT'S POSITION**

15      The Attorney General has suggested, without pointing to any

16  concrete examples, that it is possible that the Board, when invoking

17  the crime as a reason to deny parole, is not placing it within

18  §2402(c)(1) but instead using is as some sort of 'lesser factor'

19  which, only when combined with other unsuitability criteria, can

20  contribute to a valid parole denial.  The two problems with this

21  position are, first, there is no evidentiary support for this

22  assertion, and second, it would have no impact on the constitutional

23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was

25  utilizing the crime as a 'lesser factor' which needs others to fully

26  support a parole denial, the Board would then be admitting it was

27  denying parole, in part, for the very reason that the person is

28

1  before the panel and eligible for parole in the first place - the

2  commitment offense.  Respondent's argument suggests that a crime that

3  only qualified as the *Dannenberg* "minimum necessary" could still be

4  invoked as a reason for denying parole.  Respondent argues that when

5  the crime is invoked 'not in the *Dannenberg* sense,' there must be

6  other reasons for the parole denial and the crime alone would not be

7  enough in this context.  This position is inconsistent with the law

8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly

10  egregious," or one where "no circumstances of the offense reasonably

11  could be considered more aggravated or violent than the minimum

12  necessary to sustain a conviction for that offense."  (*Dannenberg*,

13  *supra*, 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.

14  If a crime consists of only the bare elements then it is not

15  aggravated and it cannot, in and of itself, serve as a basis for

16  parole denials once the inmate becomes eligible for parole.  It is

17  the reason an inmate may be incarcerated initially for the equivalent

18  of 15 or 25 years, and then examined to determination rehabilitation

19  efforts when they come before the Board, but a crime that is no more

20  than the bare minimum cannot be factored into the equation pursuant

21  to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the

23  commitment offense can be used outside of §2402(c)(1).  If for

24  example a crime had its roots in gang allegiances or rivalries and

25  the inmate continued to associate with gangs while incarcerated, then

26  an aspect of the crime, even if the crime otherwise consisted of no

27  more than the minimum elements, could be combined with other behavior

28

1  to support a parole denial. Similarly, if a crime was rooted in an

2  inmate's then existing drug addiction, and the Board was to point to

3  a recent 115 involving drugs, the evidence that the inmate's drug

4  issues had not been resolved would justify a parole denial even if

5  the crime itself was not aggravated. A finding that the inmate is

6  not suitable for release under these circumstances, however, is not

7  based on the facts of the commitment offense as tending to show

8  unsuitability. It is based on the conclusion that can be drawn about

9  Petitioner's lack of rehabilitation or change since the offense, and

10 thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's

12 methodology or analysis, nor provided any actual evidence of the

13 crime being invoked *other* than pursuant to §2402(c)(1). Drawing

14 conclusions from the Board's direct statements, or its precise

15 recitations of the §2402(c)(1) language, logically indicates an

16 invocation of §2402(c)(1), and Respondent's suggestion otherwise is

17 insupportable.

18

19                    **THE QUESTION OF BIAS**

20      Because the issue has been squarely presented, and strenuously

21 argued by Petitioners, this Court is obligated to rule on the charge

22 that the Board's actions prove an overriding bias and deliberate

23 corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*

25 *Aikens* (1983) 460 U.S. 711, the United States Supreme Court

26 acknowledged "there will seldom be 'eyewitness' testimony as to the

27 [] mental processes" of the allegedly biased decisionmaker. Instead,

28

                           23

1  an examination of other cases for trends or patterns can provide the

2  necessary circumstantial evidence.   (See *Aikens, supra*, at footnote

3  2.)   Reaffirming that such circumstantial evidence will be sufficient

4  the Court stated: "The law often obliges finders of fact to inquire

5  into a person's state of mind.  As Lord Justice Bowen said in

6  treating this problem in an action for misrepresentation nearly a

7  century ago, 'The state of a man's mind is as much a fact as the

8  state of his digestion.  It is true that it is very difficult to

9  prove what the state of a man's mind at a particular time is, but if

10  it can be ascertained it is as much a fact as anything else.'"

11  (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12  Ch. Div. 459, 483.)[7]

13       The discovery in these cases was granted in part due to the

14  Petitioners' prima facie showing of bias and the necessity that it be

15  "adequately supported with evidence" if such evidence is available.

16  (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5.  See also *Nasha v.*

17  *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18  to show bias or prejudice on the part of an administrative decision

19  maker is required to prove the same 'with concrete facts.'"  And see

20  *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21  841: "The challenge to the fairness of the adjudicator must set forth

22  concrete facts demonstrating bias or prejudice."  See also *Hobson v.*

23

24  [7] As occurred in *Aikens, supra*, and as suggested in prior orders of this Court, Respondent should have provided direct evidence from the decisionmakers.  While the fact that a *Defendant* does not explain his or her actions cannot be held against

25  him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S. 610,) it is appropriate to give some weight to the consideration that the Board has failed to offer any direct evidence or explanation on its own behalf.  While the

26  case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the proposition that Petitioner may not inquire into the Board members mental

27  processes, Respondent is not precluded from offering such direct evidence if they were able to testify as to their good faith and conscientious efforts.

28

1   *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2   school desegregation case in which the court determined from a

3   statistical and factual analysis that racial bias was influencing

4   policy.)

5        In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6   a similar claim of biased decision making was asserted and it was

7   rejected because, although the defendant clearly articulated it, "he

8   has not demonstrated it.  Therefore, he has failed to bear his burden

9   of showing a constitutional violation as a demonstrable reality, not

10  mere speculation."  In the present cases Petitioners have provided

11  overwhelming concrete evidence.  It is difficult to believe that the

12  Board's universal application of §2402(c)(1) has been an inadvertent

13  mistake or oversight on their part.  It is hard to credit the Board's

14  position that it does not know its own patterns and practices reveal

15  a complete lack of standards or constraints on their power.

16  Respondent's protestations ring hollow, and it seems a statistical

17  impossibility, that the Board's use of "detailed" criteria in such a

18  fashion that they are rendered meaningless is a result of good faith

19  efforts on their part.  That <u>every</u> murder is "especially heinous,

20  atrocious or cruel," and can therefore be an exception to the rule

21  that a parole date should be set, does not seem to be an accident on

22  their part.

23       Although no court has thus far agreed with the accusation that

24  the Board approaches its duties with a predetermination and a bias,

25  no court has previously been presented the comprehensive evidence

26  outlined herein.  While this Court does not turn a blind eye to the

27  reasonable conclusion that the Board's unconstitutional practices are

28

1   willful, there is another possibility. The pattern of errors

2   demonstrated by the discovery in this case, and the continuously

3   growing body of Court of Appeal opinions finding consistent and

4   persistent abuse of discretion, may instead be caused by the fact

5   that the Board is simply overworked and substantively untrained. The

6   impossibility of the blanket applicability of §2402(c)(1) may be only

7   the result of sloppy preparation and inadvertent carelessness.

8       The Board must first be given an opportunity to comply with the

9   necessary remedy provided by this court before it is possible to

10   enter a finding of conscious bias and illegal sub rosa policy. To do

11   otherwise would ignore the complexities and magnitude of the largely

12   discretionary duties with which that Board is vested.

13

14                    **CONCLUSION**

15       The conclusive nature of the proof in this case, and the

16   suggestion of institutional bias do not preclude formulation of an

17   remedy which will guarantee adequate restrictions on, and guidance

18   for, the Board's exercise of discretion in making parole suitability

19   determinations. The Board can be made to lawfully perform its duties

20   if given explicit instructions.

21       As noted supra, a reason the proof in this case irrefutably

22   establishes constitutional violations is because the Board does not,

23   in actual fact, operate within the limiting construction of the

24   regulations. The Board's expansive interpretation allows it to

25   operate without any true standards. Although numerous rulings of

26   both state and federal courts of appeal have invalidated the Board's

27   application of the §2402(c) criteria to particular facts, the Board

28

1  does not take guidance from these binding precedents and ignores them

2  for all other purposes.  In the most recent of these cases, *In re*

3  *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District

4  held four of five §2402 factors "found" by the Board to be

5  unsupported by any evidence.  At footnote 14 the court took the time

6  to criticize the Board for its repeated use of a "stock phrase"

7  "generically across the state."  The court also clarified that "at

8  minimum, the Board is responsible for articulating the grounds for

9  its findings and for citing to evidence supporting those grounds."

10        There is nothing in the evidence presented that would allow any

11  conclusion but that, without intervention of the Courts, the Board

12  will ignore the lessons of these rulings in the future and continue

13  to employ its formulaic approach of citing a criteria from

14  §2402(c)(1), repeating the facts of the crime, but never

15  demonstrating a logical connection between the two.  This is the

16  core problem with the Board's methodology -- they provide no

17  explanation or rationale for the findings regarding the crime itself.

18    This practice results in violence to the requirements of due

19  process and individualized consideration which are paramount to the

20  appropriate exercise of its broad discretion.

21        The only solution is one that compels the Board to identify the

22  logical connection between the facts upon which it relies and the

23  specific criteria found to apply in the individual case.  For

24  example, the Board often finds that an inmate's motive is "trivial"

25  without ever suggesting why, on these facts, that motive is not just

26  as trivial as the motive behind any other murder.  What motive is not

27  trivial?  By any definition "trivial" is a word of comparison and

28

1  only has meaning when there can be examples that are not "trivial."

2      Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (In

4  re Smith (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9      Respondent has consistently refused to suggest what possible

10  instances of murder would not fit the Board's amorphous application

11  of the §2402 criteria.  Citing Dannenberg, Respondent insists such

12  comparative analysis is unnecessary.  Respondent fundamentally

13  misunderstands the Dannenberg holding.

14      The PC § 3041(b) exception to the rule can only be invoked when

15  the "gravity of the current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses,

17  is such that consideration of the public safety requires a more

18  lengthy period of incarceration for this individual."  The word

19  "gravity" is a directive for comparison just as "more lengthy"

20  indicates a deviation from the norm.  While Dannenberg held there

21  does not need to be intra case comparison for the purposes of term

22  uniformity or proportionality, there necessarily has to be some sort

23  of comparison for the purposes of adhering to the legislative mandate

24  that parole is available.  This is implicit in §2402 because the

25  qualifier "especially," in "especially heinous atrocious or cruel,"

26  requires that some form of comparison be made.  While the original

27  drafters of §2402 seemed to have recognized this fact, the ongoing

28

1    conduct of the Board has completely ignored it, and this is the

2    essence of the due process violation Petitioners have asserted.

3         As noted in his dissent in the recent case of *In re Roderick,*

4    *supra,* Justice Sepulveda would have deferred to the Board's

5    'exercise' of discretion because "Board members have both training

6    and vast experience in this field.  They conduct literally thousands

7    of parole suitability hearings each year.  The Board therefore has

8    the opportunity to evaluate the egregiousness of the facts of a great

9    number of commitment offenses.  ...  The Board's training and

10   experience in evaluating these circumstances far exceeds that of

11   most, if not all, judges."  The evidence in this case, however,

12   suggests a flaw in granting such deference.  Since the Board

13   continues to place every murder in the category of offenses "tending

14   to show unsuitability," something is certainly wrong.  Since the

15   Board's vast experience is undeniable, the problem must be in the

16   Board's training and understanding of the distinguishing features of

17   the guidelines and criteria.  Although Justice Sepulveda presumes

18   that Board members receive substantive training, there is no evidence

19   before this court to suggest that it does, and substantial

20   circumstantial evidence to suggest that it does not.

21        In the vast numbers of Santa Clara County cases reviewed by this

22   Court, the Board's formulaic decisions regarding the commitment

23   offense do not contain any explanation or thoughtful reasoning.

24   Instead, the Board's conclusionary invocation of words from

25   §2402(c)(1) is linked to a repetition of the facts from the Board

26   report by the stock phrase: "These conclusions are drawn from the

27   statement of facts wherein ..."  Thereafter the inmate files a habeas

28

1   corpus petition and Respondent, after requesting an extension of
2   time, files a boilerplate reply asserting the Board's power is
3   "great" and "almost unlimited" and thus any "modicum" of evidence
4   suffices.  Respondent does not cite or distinguish the expanding body
5   of case law that is often directly on point as to specific findings
6   made.  Thereafter, if the writ is granted, the Board is directed to
7   conduct a new hearing "in compliance with due process" and that order
8   is appealed by Respondent.  On appeal the order is usually upheld
9   with modifications and in the end, after countless hours of attorney
10  and judicial time, the Board conducts a new two hour hearing at which
11  they abuse their discretion and violate due process in some different
12  way.

13      This system is malfunctioning and must be repaired.  The
14  solution must begin with the source of the problem.  The Board must
15  make efforts to comply with due process in the first instance.  The
16  case law published over the last five years provides ample and
17  sufficient guidelines and must be followed.  Although the Board
18  methods suggest it believes this to be optional, it is not.

19

20                          **THE REMEDY**

21      Thus, it is the order of this Court that the Board develop,
22  submit for approval, and then institute a training policy for its
23  members based on the current and expanding body of published state,
24  and federal, case law reviewing parole suitability decisions, and
25  specifically the application of §2402 criteria.  In addition to
26  developing guidelines and further criteria for the substantive
27  application of §2402 the Board must develop rules, policies and
28

1 | procedures to ensure that the substantive guidelines are followed.

2 | This Court finds its authority to impose this remedy to flow

3 | from the fundamental principles of judicial review announced over two

4 | centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5 | Citing that landmark case, the California Supreme Court has

6 | recognized "Under time-honored principles of the common law, these

7 | incidents of the parole applicant's right to 'due consideration'

8 | cannot exist in any practical sense unless there also exists a remedy

9 | against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10 | In *Strum* the court directed that the Board modify its rules and

11 | procedures so that thereafter "The Authority will be required [,]

12 | commencing with the finality of this opinion, to support all its

13 | denials of parole with a written, definitive statement of its reasons

14 | therefor and to communicate such statement to the inmate concerned."

15 | (*Sturm* at p. 273.)

16 | Similarly, in the case of *Minnis, supra*, the California Supreme

17 | Court held the Board's policy of categorically denying parole to drug

18 | dealers was illegal. Based on its analysis the court there was

19 | clearly prepared to order that Board to modify its rules and

20 | procedures however such was unnecessary because the Board

21 | "voluntarily rescinded" the illegal policy. While the remedy in this

22 | case is of greater scope than that necessary in either *Strum* or

23 | *Minnis, supra*, so too has been the showing of a systematic abuse of

24 | discretion and distortion of process.

25 | The most recent case to address the court's roles and duties in

26 | overseeing the parole suitability process has been *In re Rosenkrantz,*

27 | *supra*, 29 Cal.4th 616. In that case the court explained that

28 |

1  judicial review of a Governor's parole determination comports with,

2  and indeed furthers, separation of powers principles because the

3  courts are not exercising "complete power" over the executive branch

4  and do not "defeat or materially impair" the appropriate exercise or

5  scope of executive duties.  (*Rosenkrantz* at p. 662.)  Citing *Strum,*

6  *supra*, the court reaffirmed that a life term inmate's "due process

7  rights cannot exist in any practical sense without a remedy against

8  its abrogation." (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an

10 extreme example but which, unfortunately, has been shown to exist in

11 this case.  The court stated: "In the present context, for example,

12 judicial review could prevent a Governor from usurping the

13 legislative power, in the event a Governor failed to observe the

14 constitutionally specified limitations upon the parole review

15 authority imposed by the voters and the Legislature."  This is

16 exactly what the evidence in this case has proven.  As noted above

17 the Board has arrogated to itself absolute authority, despite

18 legislative limitations and presumptions, through the mechanism of a

19 vague and all inclusive, and thus truly meaningless, application of

20 standards.  The remedy this Court is imposing is narrowly tailored to

21 redress this constitutional violation.

22      The consequence of the Board's actions (of giving § 2402(c)(1)

23 such a broadly all encompassing and universal application) is that

24 they have unwittingly invalidated the basis of the California Supreme

25 Court's holding in *Dannenberg*.  The reason the four justice majority

26 in *Dannenberg* upheld the Board's standard operating procedures in the

27 face of the Court of Appeal and dissent position is because "the

28

1  Board must apply detailed standards when evaluating whether an

2  individual inmate is unsuitable for parole on public safety grounds."

3  (*Dannenberg* at p. 1096, footnote 16.  See also page 1080: "the

4  regulations do set detailed standards and criteria for determining

5  whether a murderer with an indeterminate life sentence is suitable

6  for parole.")  However, Petitioners in these cases have proven that

7  there are no "detailed standards" at all.  Instead the Board has

8  systematically reduced the "detailed standards" to empty words.  The

9  remedy this Court orders, that there truly be "detailed standards,"

10 requires the promulgation of further rules and procedures to

11 constrain and guide the Board's powers.  This remedy differs in

12 specifics, but not in kind, from what courts have previously imposed

13 and have always had the power to impose.

14      The Board must fashion a training program and further rules,

15 standards and regulations based on the opinions and decisions of the

16 state and federal court cases which provide a limiting construction

17 to the criteria which are applied.[8]  The Board must also make

18 provisions for the continuing education of its commissioners as new

19 case law is published and becomes binding authority.  This Court will

20 not, at this point, outline the requirements and lessons to be taken

21 from the above cases.  It is the Board's duty, in the first instance

22 to undertake this task.  The training program, and associated rules

23 and regulations, shall be served and submitted to this Court, in

---

[8] While the showing and analysis in this case was limited to § 2402(c)(1), the conclusions that the evidence compelled, that the Board has been carelessly distorting and misapplying the regulations, is not so limited.  Accordingly, the training program that is necessary for the Board can not reasonably be limited to just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and establishes remedies for other due process violations they must also be incorporated into the necessary rules and training the Board is required to abide by.

1 writing, within 90 days.   Counsel for Petitioners, and any other

2 interested parties, may submit briefs or comments within 30 days

3 thereafter.   After receipt and review of the materials this Court

4 will finalize the training program, and associated rules, and the

5 Petitioners in these cases shall receive a new hearing before a Board

6 that does not operate with the unfettered discretion and caprice

7 demonstrated by the evidence here presented.

8                                    **ORDER**

9      For the above reasons the habeas corpus petition is granted and

10 it is hereby ordered that Petitioner be provide a new hearing which

11 shall comply with due process as outlined above.   Respondent shall

12 provide weekly updates to this Court on the progress of its

13 development of the new rules and regulations outlined above.

14

15

16

17 DATED:   _Aug 30_ , 2007        _Linda R. Condron_

18                                 LINDA R. CONDRON
                                   JUDGE OF THE SUPERIOR COURT

19

20 cc:   Petitioner's Attorney (Jacob Burland)
          Attorney General (Denise Yates, Scott Mather)

21

22

23

24

25

26

27

28

34

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
# IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| In the Matters of<br><br>**ARTHUR CRISCIONE**<br><br>Petitioners On Habeas Corpus. | **(ENDORSED)**<br>**F I L E D**<br>AUG 3 0 2007<br><br>KIRI TORRE<br>Chief Executive Officer/Clerk<br>Superior Court of California, Santa Clara<br>BY BRET MORROW _____ DEPUTY |
| **PROOF OF SERVICE BY MAIL OF:** | |
| **ORDER OF COURT (Penal Code §871.5)** | **CASE NOS.:**<br>**71614** |

<u>CLERK'S CERTIFICATE OF SERVICE</u>

I CERTIFY THAT I AM NOT A PARTY TO THIS CAUSE AND THAT A TRUE COPY OF THIS DOCUMENT, *ORDER OF COURT [Penal Code §871.5])*, WAS HAND-DELIVERED INTO THE BELOW-LISTED AGENCY'S INTER-OFFICE PICK-UP BOX, (WHERE APPLICABLE), OR MAILED WITH FIRST CLASS POSTAGE PREPAID IN A SEALED ENVELOPE ADDRESSED AS SHOWN BELOW, AND THESE DOCUMENTS WERE PLACED FOR PICK-UP OR MAILED AT SAN JOSE, CALIFORNIA ON DATE SHOWN BELOW.

DATED: _____AUG 3 0 2007_____          KIRI TORRE, CHIEF EXECUTIVE OFFICER/CLERK

BY: _____BRET MORROW_____
Bret Morrow, Deputy Courtroom Clerk

| **Petitioners:**<br>Morris Bragg, Viet Ngo, Donnell Jameison, Arthur Criscione, Donnie Lewis<br><br>c/o<br>Jacob Burland, Esq.<br>Law Offices of Jacob Burland<br>3790 Via de la Valle, Suite 103E<br>Del Mar, CA 92014 | **Respondent:**<br>Scott Mather, Deputy Attorney General<br>Denise A. Yates, Deputy Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>455 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102-7004 |
|---|---|
| **CJIC:**<br><br>(Placed in inter-department pick-up box) | **RESEARCH:**<br><br>(Placed in inter-department pick-up box) |

# DECLARATION OF SERVICE BY MAIL

Case: **Clark v. Hernandez** (Habeas Corpus)


I declare that I am a citizen of the United States.  I am over the age of 18 and am not a party to the within title cause.

On **February 29, 2008**, I served the attached

**Petition for Writ of Habeas Corpus, Memorandum of P&As; Exhibits**


on the parties listed below by enclosing same in an envelope to which adequate postage was affixed, and depositing same at the United States Post Office in Walnut, California for mailing.


      **Attorney General**
      **110 W. "A" Street, Suite 1100**
      **San Diego, California 92186-5266**


I declare, under penalty of perjury, that the facts I have stated above are true and correct.


Dated **February 29**, 2008, at Walnut, California


Declarant


CLARK v. HERNANDEZ; Petition for Writ of Habeas Corpus

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| **Joseph Clark** | **Robert Hernandez** |

08 MAR -3 PM 4:42
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: RM    DEPUTY

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Linda Buchalter
1011 5th Street, #6
Santa Monica, CA 90403
310-393-7033

ATTORNEYS (IF KNOWN)

**'08 CV 0399 H PCL**

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only)    FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

### 28 U.S.C. 2254

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC81 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 861 HIA (13958) | ☐ 850 Securities/Commodities Exchange |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Electment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ Security Act | | |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ | Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☐ NO |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY (See Instructions): | JUDGE | | Docket Number |
|---|---|---|---|

| DATE    March 3, 2008 | SIGNATURE OF ATTORNEY OF RECORD    R Muller |
|---|---|

148301 $5.00 su 3/3/08

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# # 148301    — SH

## March 03, 2008
## 16:35:47

## Habeas Corpus
USAO #.: 08CV0399
Judge..: MARILYN L HUFF
Amount.:                     $5.00 MO
Check#.: 101256839739


## Total—> $5.00


FROM: JOSEPH CLARK